Robert I. SILVERMAN, et al., Appellants,

v.

Marion BARRY, Mayor of the District of Columbia, et al.

No. 86–7037.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1987.

Decided May 3, 1988.

Rehearing En Banc Denied July 15, 1988.

Burton A. Schwalb, Washington, D.C., for appellants.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellees, Barry, Mayor of the District of Columbia, et al.

Lynne Bernabei, Washington, D.C., for appellee, The Group to Save Van Ness South for Everybody, Inc.

Before WALD, Chief Judge, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants in this case are suing the District of Columbia for denying them permission to convert a rental apartment building they own to cooperative or condominium apartments. They bring both constitutional and statutory claims, and challenge both the District's actions and the conversion statutes under which it acted. Appellants seek damages in the amount of the difference between the price they sold the building for, and the price they could have obtained had they been permitted to convert it.

Appellants are the sole general partners in a limited partnership that owned Van Ness South, an apartment building in the Northwest section of Washington, D.C. In 1979 and 1980, they attempted without success to convert the building to cooperative or condominium apartments. Eventually, they sold the still-unconverted building and filed suit in U.S. District Court alleging that they had been illegally prevented from converting it. They contended in the suit that in denying them permission to convert the building, the District of Columbia deprived them of due process and equal protection of the law in violation of the Fifth Amendment. In addition, appellants challenged the statutes regulating conversion as violating the Due Process Clause of the Fifth Amendment and the D.C. Home Rule Act.

The district court held that neither the District's actions nor the statutes under which it acted violated appellants' rights to due process or equal protection. It also found the claim under the D.C. Home Rule Act to be without merit. We affirm that decision.

I. BACKGROUND

Appellants are the sole general partners in Van Ness Properties III, a District of Columbia limited partnership. The partnership built and owned a 625-unit apartment building known as Van Ness South, located at 3003 Van Ness Street, in Northwest Washington. Appellants bring this suit against the District of Columbia, the District's Department of Housing and Community Development (DHCD), and three officers of the District, including the Mayor. Appellee-intervenor, Group to Save

Van Ness South for Everybody, Inc., is a tenant group organized in 1980 and incorporated in 1981 for the purpose of maintaining Van Ness South as rental property.

This case marks *Silverman v. Barry*'s second appearance on the docket of this court. Filed initially in the D.C. District Court, the suit was dismissed by that court for want of jurisdiction. That decision was overturned on appeal by this court, and the case was remanded to the district court for trial. *See Silverman v. Barry*, 727 F.2d 1121 (D.C.Cir.1984). The district court then heard the case on the merits and dismissed with prejudice. *Silverman v. Barry*, No. 81–0394 (D.D.C. Filed Aug. 22, 1986) (Findings of Fact and Conclusions of Law). Appellants appeal from that decision.

### A. *District Regulation of Conversions*

The District of Columbia has long regulated the conversion of rental property to cooperatives and condominiums. The regulation of condominium conversion within the District began with the Condominium Act of 1976 which restricted condominium conversions to buildings that were "high rent" according to a statutory formula, that had a threshold vacancy rate, or in which a majority of the tenants consented to conversion. D.C.Law 1–89, *codified in* D.C.Code §§ 5–1201 et seq. (1978 Supp.). That statute, with changes not material to this case, remained in effect until May 29, 1979, when the District's moratorium on "high rent" conversions began. As of April 1979, condominium conversions were begun by filing condominium instruments with the Recorder of Deeds. District regulations required the applicant then to obtain a Certificate of Eligibility (C/E) from the District.

The regulation of cooperative conversions within the District dates back considerably earlier. Since 1940, the District of Columbia Cooperative Association Act has required building owners to file articles of incorporation to convert a building to a cooperative. *See* D.C.Code §§ 29–801 et seq. (1973). From 1975 to 1979, the District enacted a series of consecutive emergency and non-emergency acts that made it considerably more difficult than previously to convert rental apartments to cooperatives. The first emergency act, in effect from January 25, 1979 to April 25, 1979, prohibited conversion of rental property in the District to cooperatives except that the Mayor could grant an "exemption" in three cases: (i) if fewer than fifty percent of the units in the building were occupied; (ii) if at least 51 percent of the tenants consented to the conversion; or (iii) if the building qualified as "high rent" according to a statutory formula. D.C.Law Act 3–2, Jan. 25, 1979, 25 D.C.R. 7680 (1979). To convert to cooperatives as a "high rent" building, the District, by rule and practice, required the applicant to obtain a Certificate of Exemption ("C/Ex") from the conversion moratorium. Before issuing a "high rent" C/Ex or C/E, DHCD verified that the rents in the application exceeded the statutory minimums necessary to qualify for "high rent."

The emergency acts regulating cooperative conversions were passed by the District in smooth succession with one exception: the seventh reenactment of the emergency act expired on April 25, 1979, and the eighth did not become effective until May 4, 1979. A nine-day gap was thus created during which a building in the District could be converted to cooperatives by the owner simply filing articles of incorporation with the Recorder of Deeds. Even during the gap, however, the DHCD took the position that an owner had to obtain a C/Ex before it would approve a cooperative conversion. (Although a nine-day gap existed in the regulation of cooperatives, appellants' application was pending for only six business days. Appellants filed their application on the second day of the gap, April 26, and two of the nine days were weekend days, on which the DHCD office was closed.)

On May 29, 1979, the District enacted a moratorium on "high rent" cooperative and condominium conversions. The Emergency Condominium and Cooperative Stabilization Act of 1979 prohibited the District from issuing any high rent C/E's or C/Ex's. D.C.Act 3–44, 26 D.C.R. 10363 (1979). The

original Act lasted 90 days, but it was followed by three similar 90–day emergency acts, D.C.Act 3–95, 26 D.C.R. 1014 (1979); D.C.Act 3–132, 26 D.C.R. 2436 (1979); D.C.Act 3–151, 27 D.C.R. 849 (1980), and on February 23, 1980 by an emergency act which went into effect for 180 days. Condominium and Cooperative Conversion Stabilization Act of 1979, D.C.Law 3–53, 27 D.C.R. 37, 958 (1980). These moratoria, directed at high-rent conversions, did not affect conversions based on tenant-consent procedures or on vacancies.

On October 19, 1979, the D.C. Superior Court held that the District's practice of enacting successive emergency acts instead of passing permanent legislation violated the District of Columbia Self–Government and Government Reorganization Act, P.L. 93–198, 1 D.C.Code §§ 121 et seq., as amended (1979 Supp.) ("Home Rule Act"). The court enjoined enforcement of the emergency act then in effect governing cooperative and condominium conversions. *Washington Home Ownership Council, Inc. v. District of Columbia*, No. 10624–79 (D.C.Sup.Ct. Oct. 19, 1979). On October 22, the District of Columbia Court of Appeals stayed the Superior Court order. *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349, 1350 n. 4 (1980) (en banc). During the pendency of the appeal, the District continued to pass emergency acts that imposed the same restrictions on conversion to cooperatives and condominiums that the previous acts had.

On May 28, 1980, the Court of Appeals sitting *en banc* affirmed the Superior Court's holding, but stayed enforcement of its decision for 90 days to provide the District "an appropriate interval in which to deal with its emergency legislation," *id.* at 1360, and remanded the case. On December 3, 1980, the Superior Court ruled on remand that its decision would be prospective only. As a result, the emergency acts passed prior to August 28, 1980—the date on which the Court of Appeals mandate issued—remained valid law. *Washington Home Ownership Council, Inc. v. District of Columbia*, No. 10624–79 (D.C.Sup.Ct. Dec. 3, 1980).

Before the Court of Appeals mandate issued, on August 10, 1980, the Mayor signed into law the Rental Housing Conversion and Sale Emergency Act of 1980, which was enacted for 90 days as emergency legislation. D.C.Act 3–248, 27 D.C.R. 3954 (1980). It was, in the wake of the decision in *Washington Home Ownership Council*, the last emergency act that the District could pass governing conversions. In September, the August 10 emergency act was superseded by a permanent District law, the Rental Housing Conversion and Sale Act of 1980. D.C.Law 3–86, D.C. Code §§ 45–1601 et seq. (1981). The 1980 Act required tenant consent as a prerequisite to conversion of rental property in the District. To be approved, a plan to convert had to receive the votes of over 50 percent of qualified voters in a conversion election.

The application to convert Van Ness South was filed against the backdrop of a recent change in mayoral administrations. On January 1, 1979, Mayor Marion Barry took office. Mayor Barry appointed Robert L. Moore the new Director of DHCD. The record indicates that Moore may have believed that condominium and cooperative conversions in the District were occurring too rapidly. *Silverman v. Barry*, Findings of Fact ¶ 12. Shortly after his appointment, Moore transferred the administration of cooperative and condominium conversions from the Neighborhood Improvement Administration to his own office. Appellants contend that this transfer marked the start of a concerted effort to stymie conversions until a moratorium could be enacted. In particular, they point to a memorandum written to Moore by a DHCD officer, Maria L. Johnson, recommending ways to restrict conversions by administrative means, which included the suggestion that housing conversions could be delayed administratively for as long as 60 days.

Conversion applications were granted slowly during the first half of 1979. Between March 12, 1979 and May 29, 1979 no new high rent or tenant consent application for a C/E or C/Ex filed after March 12, 1979 was acted upon. Findings of Fact ¶ 15. The DHCD did, however, continue to

grant C/E's and C/Ex's during this time. When the Van Ness South application was filed, DHCD records show that more than 60 applications were on file. The district court found that the applications were handled in roughly chronological order. DHCD records show that a number of the pending applications were approved for cooperative or condominium conversion, and that those approved were not all for small buildings. Among them were a 315-unit condominium conversion approved on May 15, 1979, and a 290-unit cooperative conversion approved on April 11, 1979.

## B. *The Van Ness South Application*

On April 26, 1979, appellants filed applications with the District for a C/Ex to convert Van Ness South to cooperatives and for a C/E to convert to condominiums under the "high rent" provision of the Condominium Act of 1976. Appellants' applications were notarized, and contained the information required by the statutes, including information on rents to substantiate the claim of eligibility for high-rent condominium conversion. Appellants applied for a C/E as part of their condominium application. In addition, although the application was made during the nine-day gap between cooperative conversion statutes, appellants nevertheless applied for a C/Ex, because they contend that the District continued to require one.

The District had not acted on appellants' applications by May 4, the end of the nine-day statutory gap. The district court, noting that more than 60 conversion applications were on file at the time, concluded that it appeared that Van Ness South was not granted a C/Ex during the nine-day gap because of the volume of applications pending before the DHCD. *Silverman v. Barry*, Findings of Fact ¶ 13. On May 4, 1979, the eighth reenactment of the Emergency Cooperative Regulation Act of 1979 went into effect. Like those that preceded it, the May 4 law imposed a general prohibition on cooperative conversions, except that the Mayor was authorized to grant exceptions in three cases: buildings with over a 50% vacancy rate, buildings in which a majority of tenants approved the conversion in writing, and buildings that were "high rent" according to a statutory formula. D.C.Act 3–37, 26 D.C.R. 9918 (1979).

The DHCD still had not acted on the Van Ness South application by May 29, when the District enacted the first of several acts that restricted conversions still further. The Emergency Condominium and Cooperative Stabilization Act of 1979 eliminated the "high rent" exception to the ban on cooperative and condominium conversions. That act was followed by several successive emergency acts that continued the prohibition on "high rent" conversions. As long as these prohibitions remained in effect, the only route for conversion of Van Ness South was a tenant consent conversion.

In early 1980, appellants entered into a contract to sell Van Ness South, on the assumption that it would ultimately be permitted to convert. On January 28, 1980, they contracted with The Investment Group Development Corporation ("The Investment Group") to sell the Van Ness South building and the land on which it was built for $40,130,000.00. The contract was terminable, however, if a C/E or C/Ex were not granted for the building within a certain amount of time, or if the Superior Court's decision in *Washington Home Ownership Council* were overturned. On February 20, 1980, appellants informed the Van Ness South tenants of their intent to sell, gave notice of their intent to convert, and, as required by District law, offered to sell the property instead to a corporation comprised of the Van Ness South tenants. On May 20, 1980, the Van Ness South Tenants Association ("VNSTA") approved by majority vote a purchase of the building on the terms offered to the Investment Group, for conversion to condominiums or cooperatives. Two days later, VNSTA entered into a contract to purchase the building for $40,130,000.00.

With the contract signed, VNSTA attempted to convert Van Ness South by tenant consent. The Condominium Act of 1976 and District rules required a building owner to file consent forms signed by a majority of the heads of households in a

building. D.C.Code § 5–1281(b)(2). On May 23, 1980, prior to distributing consent forms to tenants, VNSTA submitted a sample consent form to DHCD, which gave its advance approval to the form. At the time, DHCD did not indicate that the forms would have to be verified. By June 17, 1979, VNSTA had collected signed consent forms from 319 of the 603 eligible households in Van Ness South consenting to the conversion of the building to condominiums or cooperatives. In apparent possession of a majority, VNSTA filed for a C/E pursuant to the tenant-consent provision of § 5–1281(b)(2). In support of its application, VNSTA submitted its 319 consent forms to DHCD. On June 23, 1980, VNSTA submitted an application for a C/Ex to convert the building to a cooperative, and submitted 10 additional tenant consent forms. Without yet having obtained a C/E, on July 28, 1980 VNSTA submitted its application to convert Van Ness South to a condominium, and included a $23,125 fee.

From June 28 to August 6, on seven separate occasions, consent forms, rescissions of consent, and rescissions of declaration of non-consent for the Van Ness South application were filed with DHCD. On June 28, 1980, the appellee-intervenor, Group to Save Van Ness South for Everybody ("the Group"), submitted 33 rescissions of consent to convert Van Ness South. On July 8, VNSTA submitted eight additional consent forms. On July 25, VNSTA submitted seven more consents, and three days later an additional four. On August 4, VNSTA submitted 17 additional consent forms, five rescissions of declaration of non-consent, and five new consent forms signed by tenants who had previously revoked consent forms that had been filed. On August 5, VNSTA submitted one consent to convert and five rescissions of declaration of non-consent. On August 6, VNSTA submitted one consent to convert.

As a matter of policy, the DHCD did not consider any tenant consent to be valid until it was verified by a member of the DHCD staff. The office verified consents by telephoning residents during regular business hours. If the tenant could not be reached after three telephone calls, the DHCD would attempt to reach him or her by other means, such as leaving messages at the building's front desk, or trying to relay a message through the tenants' association.

The District's regulations governing cooperative and condominium conversions did not state that consent forms had to be confirmed. Nor did DHCD supply applicants with any written notification of the verification requirement. The District considered notarized consent forms to be valid without verification, but the DHCD did not mention notarization when it approved appellants' model consent form. There is, however, no evidence that appellants did not have actual notice of the policy of checking consents. The DHCD had regularly done some checking of consents in the past. Until March 1979, however, it was not DHCD policy to consider consents invalid until verified.

On August 7, 1980, the District notified VNSTA that it did not have enough validated consent forms to convert Van Ness South. Although VNSTA had submitted 344 unrescinded consents, more than a majority of the households in Van Ness South, the DHCD staff had only been able to verify 274 of those consents. On Sunday, August 10, the Rental Housing Conversion and Sale Emergency Act of 1980, D.C.Act 3–248, was signed into law. The Act eliminated tenant-consent conversions, and instead required approval by a majority of heads of households in a tenant election. VNSTA, having learned that notarized consents did not have to be verified, submitted 32 additional notarized consents on Saturday, August 9. The District, however, did not evaluate the materials submitted on that date, maintaining that it had no obligation to work beyond normal business hours verifying consent forms. The August 10 Emergency Act was later made permanent by D.C.Act 3–86, *codified in* D.C.Code §§ 45–1601 et seq.

On October 9, 1980, the DHCD informed VNSTA that its application could not be processed any further due to the new legis-

lation. On October 24, VNSTA requested a hearing on the DHCD's refusal to continue processing its application. In a letter dated December 22, 1980, Robert Moore advised VNSTA that any appeal of DHCD's refusal to issue a C/E became moot as a result of the August 10 law and the succeeding permanent legislation. Moore stated that conversion at that point could only be accomplished through compliance with the tenant election provisions of D.C.Law 3–86.

On November 7, 1980, VNSTA terminated its contract with appellants to buy Van Ness South, citing its inability to convert the building. Appellants sought to convert Van Ness South on their own pursuant to the Rental Housing Conversion Act of 1980. On November 10, 1982, a tenant election was held at Van Ness South to determine whether to convert the building to a condominium. A majority of the voters in the election opposed conversion. In 1984, appellants sold Van Ness South as a rental building for $27,000,000, an amount less than the price it was to receive in its contract with either VNSTA or the Investment Group.

In February 1981, appellants filed suit against the DHCD and several District officials under 42 U.S.C. § 1983, alleging that the District violated their due process and equal protection rights in denying them approval to convert Van Ness South. They also attached a state claim that the District acted illegally because the statutes it relied on violated the Home Rule Act. In addition, appellants contended in the suit that the appellees' actions constituted a taking, a claim they have dropped in this appeal. The district court dismissed the suit, holding that the District had not violated appellants' constitutional rights. Appellants appeal here from that judgment.

## II. DISCUSSION

Section 1983 imposes civil liability on one who

> under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws....

42 U.S.C. § 1983. The purposes of the Civil Rights Acts are to obtain compensation for persons whose civil rights have been violated and to prevent the abuse of state power. *Burnett v. Grattan,* 468 U.S. 42, 53, 104 S.Ct. 2924, 2931, 82 L.Ed.2d 36 (1984). Courts have not, however, extended the Acts to cover all wrongs committed on the state level. The Supreme Court has long instructed that "[i]t was not intended by the ... Civil Rights Acts that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 403, 88 L.Ed. 497 (1944).

Courts must strike a careful balance in applying the protections of the Civil Rights Acts. Too restrictive an application risks failing to achieve the Acts' goals of compensation and curbing governmental abuse. Too broad an application risks federalizing too many infractions that are fully remediable in state court. As this court has stated of violations of state electoral processes by state officials, "[i]f official violations of such laws automatically created federal causes of action, a great many cases involving only local issues that were fully remediable under state law would be brought in federal courts." *Grano v. Barry,* 733 F.2d 164, 169 (D.C.Cir.1984).

The Supreme Court has not enunciated a standard by which to determine precisely which state lapses constitute substantive due process violations under 42 U.S.C. § 1983. Nor has this circuit yet addressed the issue. The First Circuit, however, struck a wise balance in *Roy v. City of Augusta,* 712 F.2d 1517 (1st Cir.1983), when it stated that a plaintiff suing under § 1983 must "prove that his injury was due not merely to the law's delay and [the government's] errors but to the defendant's *deliberate disregard* of the state's *fundamental* process." *Id.* at 1524 (emphasis added).

■ To succeed in a § 1983 suit for damages for a substantive due process or equal protection violation, a plaintiff must at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities. Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983. *See, e.g., Scott v. Greenville County,* 716 F.2d 1409, 1416 (4th Cir.1983) (stating that "[d]espite the great deference accorded local officials in zoning and land use matters, their decisions and official actions are not exempt from the constitutional command to be free of racial discrimination.") Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of offical duties, do not warrant redress under this statute. *See Ortega Cabrera v. Municipality of Bayamon,* 562 F.2d 91, 103 (1st Cir.1977) (upholding dismissal of § 1983 equal protection claim because "there has been no showing of the kind of purposeful, malicious action which is a prerequisite to any such damages recovery").

Appellants assert that the District's actions relating to the conversion application of Van Ness South rose to the level of constitutional violations. Appellants' contentions encompass five distinct claims, four constitutional and one statutory. Their constitutional claims center on: (1) the District's failure to approve the conversion application during the nine-day gap from April 25 to May 4, 1979; (2) the District's purported "illegal administrative freeze" in the spring of 1979; (3) the District's failure from June to August 1980 to approve appellants' conversion application based on tenant consent; and (4) the District's reliance on a tenant election procedure that appellants contend constitutes an unconstitutional delegation of governmental authority. Appellants also allege a statutory violation: (5) the District's refusal throughout to permit conversion based on the emergency moratoria later held to be illegal in *Washington Home Ownership Council.*

The district court held that none of these actions by the District rose to the level of constitutional violations. Judge Flannery found that rather than imposing an illegal internal freeze or otherwise violating appellants' due process or equal protection rights, the District was at this time beset by "confusion," which "explains the slowness in the District's ability to process the applications." *Silverman v. Barry,* Findings of Fact ¶ 28. The court concluded:

The totality of these events suggests that the District was going through a period during which conversions to cooperative[s] and condominium[s] were to be done differently under D.C. law. While the conduct of the DHCD and the passage of successive emergency acts suggests a protracted effort by the District to deal with the problem of massive conversions, insufficient evidence exists to show the District's actions prior to passage of permanent legislation to be a deprivation of plaintiffs' rights in their property. The acts of the District are discretionary to a point before they become a deprivation of due process: that point was not reached.

*Silverman v. Barry,* Conclusions of Law ¶ 14. Because we agree with this assessment, we affirm the decision below. In so doing, we do not say that the District's actions were ideal. We hold only that at no point did the District's handling of appellants' application rise to the level of a constitutional violation or violate the Home Rule Act.

*A. The April–May 1979 Statutory Gap*

■ The first time period at issue in this appeal is the nine-day interval during which cooperative conversions were virtually unregulated in the District as a matter of law. In the nine-day period from April 25 to May 4, 1979, one emergency act regulating cooperative conversions had expired, and the next had not yet been enacted. Although appellants applied to convert Van Ness South to a cooperative on April 26, the District did not act on the application during the gap. Appellants contend that during this time they possessed an absolute right to convert their property, and that

the District denied them their due process rights when it failed to approve the conversion.

The district court found that the District's failure to act during the nine-day interval was due to the fact that this was "an extremely short interim period" during which "it was undoubtedly unclear to DHCD and its personnel what procedures they were operating under." *Silverman v. Barry*, Conclusions of Law ¶ 9. Our deference to the district court's determination is considerable. We must defer to its determination that the DHCD's delay was due to innocent confusion unless we find that holding to be "clearly erroneous." *Cf. Pullman–Standard v. Swint*, 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982) (stating that "a court of appeals may only reverse a district court's finding on discriminatory intent if it concludes that the finding is clearly erroneous under [Federal] Rule [of Civil Procedure] 52a"). In light of the shortness of the gap and the large number of applications pending, we are unable to conclude that the district court's decision that the DHCD's delay during the statutory gap was a result of confusion over the state of the law is clearly erroneous.

The District was not only justified in proceeding with deliberation and caution on appellants' application, it had an affirmative duty to do so. The law has long shown a special solicitude for the interest of a person in being secure in his or her home. *See, e.g., Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639 (1980) (stating that "the sanctity of the home ... has been embedded in our traditions since the origins of the Republic"); Radin, *Property and Personhood*, 34 STAN. L.REV. 957, 994 (1982) (discussing the "normative judgment that tenants should be allowed to become attached to places and that the legal system should encourage them to do so"). When a government is asked to approve the commencement of a process that may lead to citizens being evicted from their homes, it must act with the utmost care.

Appellants misperceive the District's role when they maintain that it deprived them of their constitutional rights by not acting more quickly on their application for a C/Ex during the statutory gap. The DHCD does not exist exclusively to process applications speedily for òwners who want to convert buildings; it has a strong countervailing duty to tenants throughout the District to proceed with caution and to grant C/E's and C/Ex's only when it has ascertained that the conversion would be in conformity with the law. The government's obligation to tenants is heightened in an ex parte situation like the instant one. The application for a C/E occurs between the building owner and the DHCD; the tenants are absent from this process and no mechanism exists for them to challenge the application. Because of their strong interest in the outcome of the application, the government has an obligation to the tenants to proceed with sufficient deliberation to ensure that tenants' rights under the law are being protected. The District was justified in acting cautiously during the statutory gap. We affirm the district court's holding on this point.

### B. *The Spring of 1979 "Administrative Freeze"*

■ Appellants' second allegation is that the District imposed an "illegal administrative freeze" in the spring of 1979. Appellants' case that such a freeze existed relies in large part simply on their contention that the DHCD was approving applications too slowly during this time. During the period from March 12, 1979 to May 29, 1979, no new high rent or tenant consent application for a C/E or C/Ex was granted or denied. *Silverman v. Barry*, Findings of Fact ¶ 15. The district court found, however, that the DHCD was handling an unusually large number of applications at this time, and that processing of large and small buildings continued throughout this time. *Id.* The court dismissed appellants' claim, stating that they "had no right to expect conversion permission within such a short period of time." *Silverman v. Barry*, Conclusions of Law ¶ 8.

Appellants present only one significant piece of evidence to suggest that the delay was at all intentional. The mere facts that conversions were an issue in an election campaign or that the government restructured its offices handling conversions provide only the most tangential support for appellants' claim. The only significant evidence they adduce is a single internal DHCD memorandum that they believe indicates the adoption of a departmental freeze. It cannot, however, when looked at in its entirety, support appellants' claim.

The memorandum at issue, dated March 12, 1979, was written by DHCD staff member Maria Johnson to DHCD director Robert Moore. Along with a series of suggestions for new legislation, the memorandum contains the statement that "[a]dministratively, the processing of most of the pending applications and all new applications could immediately be delayed for as long as sixty days." Appellants contend that the memorandum constitutes direct evidence that the District embarked on a program to halt conversions until a moratorium could be enacted.

The Johnson memorandum does appear at first to raise the possibility that DHCD began a slow-down on processing of conversion applications. However, examined in the larger context of the DHCD's entire operation, it is clear that the suggestion was just an isolated suggestion made by a single staff member that was never adopted by the DHCD. The passage to which appellants object was just one of a long list of possible actions that Johnson suggests in her memorandum. It came as part of a specific administrative restructuring suggested in the memorandum:

1. Refer all "high rent" applications to the Rental Accommodations Office for a determination of the legality of the rent levels on which we would base our determination of condominium conversion eligibility. I discussed this possibility with Mr. Albert Williams, Deputy Administrator at RAO. He indicated that they would be willing to do this review for us, however it would require an additional auditor to handle our case load. We used to refer these applications to RAO, but discontinued the practice because of excessive delays. If we were to resume the practice immediately, it would delay approvals on those buildings that are eligible for as long as sixty days.

There is no evidence in the record that the DHCD ever adopted the proposal and routed applications through RAO or that it ever stopped processing applications. The record indicates that Johnson's suggestion that the DHCD delay applications was just an idle suggestion by a staff member powerless to implement it on her own and that it was not accepted by DHCD officials in authority. It is not sufficient basis for adopting appellants' theory about an "illegal administrative freeze" or for disturbing the decision below.

### C.  June–August 1980

■ The next chapter of the Van Ness South saga occurred from June to August 1980, when the Van Ness South Tenants Association attempted to conduct a tenant-consent conversation of the building. Appellants contend that the District deprived them of their constitutional rights when it denied VNSTA a C/E. The District maintains, however, that it was justified in denying the C/E because it was unable to verify consent forms from a majority of heads of household in Van Ness South before the August 10 moratorium went into effect. The district court found that the "confusion" surrounding the Van Ness South conversion "amply justifies the use of a more accurate method of ascertaining consent," and "explains the slowness in the District's ability to process the applications." *Silverman v. Barry*, Conclusions of Law ¶ 11. This holding is supported by the record.

Considerable confusion did indeed surround the consent-verification process at Van Ness South. With 603 units, it was one of the larger buildings to submit an application to convert. In addition to the complications created by the sheer number of households in Van Ness South, the verification process was made more difficult by the steady flow of consent forms, rescissions of consent, and rescissions of re-

scissions into the DHCD office. Miriam Jones, a staff member of DHCD who worked on the verification process, described the confusion that prevailed:

> [W]e were constantly trying to tally the count. I also remember that the tenant association was constantly in touch with us to determine how many people had consented. I also remember that for every day there would be new consents, there would also be retractions of prior consent.

*Deposition of Miriam Jones* 241. Each time a tenant changed his or her position on conversion, it made more difficult the task of verification, since any prior verification of the tenant's position became worthless.

Two additional sources of confusion over the Van Ness South application were the huge volume of applications for other buildings pending in the DHCD office at the time and the small staff available to perform verifications. Perhaps because owners believed that a moratorium was imminent, perhaps for other reasons, the DHCD was inundated with conversion applications at the time that the Van Ness South application arrived. During an average month the office received approximately 5–8 applications, but during the months the Van Ness South application was pending it received 20–30. Jones stated that it was this increase in the volume of applications that prevented the office from verifying the Van Ness South consents.

The DHCD staff available to conduct the verification process was extremely small. At no time did more than three individuals work on the consent verification process. One of these staff members, Miriam Jones, was also the director of the office, and had considerable managerial duties to perform. Pamela Payne, the other staff member who did verification work, also served as the office's secretary, and had to devote substantial portions of her day to secretarial work.

A second form of confusion that existed about the Van Ness South application was the confusion that existed not at the DHCD, but among the residents of Van Ness South. The twelve rescissions of consent contained in the record indicate that the atmosphere surrounding the process of obtaining consents was highly charged. One tenant stated in her rescission:

> [T]he man in Apartment No. W–206 (Earl Droessler), who came to my apartment to have me sign a consent, told me that it would be to my advantage to sign.... Later, I learned that the D.C. Government had passed a law that would protect the rights of older people so they could keep renting their apartments. I now believe that he had me sign the paper without telling me about my rights under the new law. I think it was very unfair of him not to tell me about the new law before having me sign the consent ...

*Declaration of Bess Eldridge.* Another tenant stated that she felt she was "railroaded into conversion. I signed the consent because I didn't know what to do—I was not well informed as I was unable to attend any of the Association meetings because I am a semi-invalid and I only knew what was put under my door." *Declaration of Irene M. Deely.*

The requirement that consents be verified was not contained in the District laws concerning conversions, nor in the regulations promulgated under them. Carol Thompson, special assistant to the director of DHCD, stated that she made the decision that consent forms should be verified. She stated that she thought it was appropriate and within the rules. The record suggests that while the District had verified consents for some time, it was not District policy to reject unconfirmed consents prior to March 1979. *Silverman v. Barry,* Findings of Fact ¶ 29. Nevertheless, there is no evidence that the decision to begin verifying consents was anything other than a simple attempt to ensure that the conversion laws were properly enforced.

DHCD's concerns about the validity and sincerity of consent forms were well-founded and recognized by the conversion legislation. The Condominium Act of 1976, in describing the tenant consent conversion,

explicitly expresses concern about the possibility that consents might be improperly obtained. It states that "[n]o landlord or declarant shall use any means whatsoever to coerce any person into signing such an agreement." D.C.Law 1–89, D.C.Code § 5–1281(b)(2). The evidence adduced by appellees that some Van Ness tenants signed consent forms under coercion, or in confusion about the effect of their consents, supports the District's determination that a verification process was necessary. The record indicates that it was not begun out of whimsy or bad motives, but rather out of a concern that District residents not lose their homes through conversions done without the required number of valid consents. With the limited resources at its command, the DHCD's decision to verify consents by telephone as it did was a reasonable means of achieving this end.

An additional reason that the verification procedure was justified is that, unlike many other administrative procedures, an application to convert did not culminate in an adversarial hearing of any kind. Nor did the statute provide a mechanism for tenants who might lose their apartments to check on their own that the consent forms had been properly obtained. The onus was entirely on the District to ensure that the statutory requirements were met. The District owed a responsibility to those who opposed and might be harmed by conversion of their building to ensure that the consent forms it received were valid, and that they were obtained without coercion.

■ Given that the telephone verification procedure was reasonable, appellants' remaining objection is one of speed. Appellants had no due process right, however, to have their application acted upon before the onset of the August 10 moratorium. This court has stated that where a statute does not set a specific time limit for administrative action, governmental delay does not constitute a denial of due process merely because statutory rights have been lost in the interim. In *Givens v. United States Railroad Retirement Board,* 720 F.2d 196 (D.C.Cir.1983), this court considered the claim of a petitioner who was denied certain benefits under the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231 et seq., because § 3(h)(6) of the Act required that his entitlement to such benefits had to be determined prior to August 13, 1981, and the U.S. Railroad Retirement Board ("the Board") did not act on his appeal in that time. *Id.* at 199. The court noted that neither § 3(h)(6) nor any other statute imposed a time limit by which the Board was required to act:

> Section 3(h)(6) only provides that in order to receive dual benefits, an individual must have been determined prior to August 13, 1981, to be entitled to such benefits. Thus, section 3(h)(6) does not provide petitioner with a due process right to have had his entitlement determined prior to the cutoff date. Therefore, there was no procedure or process denied petitioner which was due him.

*Id.* at 201. As in *Givens,* the mere fact that a statutorily advantageous era was coming to a close did not invest in appellants a right to prompt resolution of their application.

The *Givens* court appeared to suggest that an extraordinarily long delay in governmental action could become "so unreasonable as to violate due process." *Id.* (*citing Kelly v. Railroad Retirement Board,* 625 F.2d 486 (3d Cir.1980), in which a three year and nine month delay in processing a disability claim without a valid reason was held to be a due process violation). But we do not reach that question today. Appellants did not submit their first consent forms to the District until June 17, 1980, and continued to submit additional forms intermittently until August 6, the day before the last business day before the conversion moratorium became law. The pace at which the District acted does not begin to approach the extreme delay that occurred in the *Kelly* case. Moreover, appellee has shown that the office in question was particularly overburdened in the time period at issue in this suit. We cannot ignore the practical constraints that operate on a government office of this sort. *Cf. Wright v. Califano,* 587 F.2d 345, 356 (7th Cir.1978) ("[W]e are not justified in sanctioning the imposition

of unrealistic and arbitrary time limitations on an agency which for good faith and unarbitrary reasons has amply demonstrated its present inability to comply."). Appellants may have shown that the District should reevaluate the staffing of DHCD; they have not shown that a deprivation of due process or equal protection occurred.

### D. *The Home Rule Act Claim*

■ Appellants also challenge the District's reliance upon emergency acts later held by the Superior Court of the District of Columbia to have been passed in violation of the D.C. Home Rule Act. In *Washington Home Ownership Council v. District of Columbia,* No. 10624–79 (D.C. Sup.Ct. Oct. 19, 1979), the D.C. Superior Court held that the D.C. City Council had exceeded its authority under the Home Rule Act and Government Reorganization Act by enacting successive identical emergency acts, and enjoined their enforcement. When the case reached him again on remand, Judge Revercomb held that his decision would not be applied retroactively. The court held that "all successive, substantially similar [emergency] statutes passed ... prior to August 28, 1980 were of full force and effect until August 28, 1980 ..." *Washington Home Ownership Council, Inc. v. District of Columbia,* No. 10624–79, slip op. at 17 (D.C.Sup.Ct. Dec. 3, 1980).

Appellants contend that because Judge Revercomb's order that his decision not be applied retroactively is not binding upon this case as a matter of res judicata, the district court should have applied his decision retroactively to invalidate the emergency acts under which the District acted in this case. Although Judge Revercomb's decision about retroactivity is not binding on this court, we find that the reasoning he used to reach it applies equally to this case. Judge Revercomb concluded that

> retroactive application of the October 19, 1979 Order would seriously disrupt the settled expectations of the District of Columbia and of those persons who have relied on the District's successive emergency legislation as substantive rules of decision, and ... [that] retroactive appli-

cation of the [O]rder would cause substantial hardship without compelling benefit ...

*Id.* 16. We see no reason that this analysis does not apply equally to the instant case, and decline to upset the district court's decision not to apply *Washington Home Ownership Council* retroactively.

The Supreme Court has long held that decisions about retroactive effect do not implicate constitutional rights. *See Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) (stating that "the federal constitution has no voice upon the subject."). The Court has, however, enumerated three factors for courts to consider in making determinations about retroactivity. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *see also Common Cause v. Federal Election Commission,* 842 F.2d 436, 449–51 (D.C.Cir.1988). First, for a decision to be suitable for nonretroactive enforcement it must "establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed ..." *Id.* 404 U.S. at 106, 92 S.Ct. at 355. That was clearly the case with the decision in *Washington Home Ownership Council,* which has significantly altered the use of emergency acts by the District. Second, the court making the determination "'must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.'" *Id.* at 106–07, 92 S.Ct. at 355 (*quoting Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)). We are unable to discern how this factor will be affected by either decision in the instant case. The decision of the court in *Washington Home Ownership Council* is now the law and has been for over seven years; by denying retroactive application in this case we do not weaken the rule in any respect or retard its operation. Finally, the *Chevron* Court stated that courts should

"weigh[ ] the inequity imposed by retroactive application ..." *Id.,* 404 U.S. at 107, 92 S.Ct. at 355. Applying the decision of *Washington Home Ownership Council* retroactively would open the District up to liability for a large number of actions taken pursuant to up to 84 separate statutes. *See Washington Home Ownership Council,* slip op. at 14 (stating that "[p]resumably, if full retroactive effect were accorded this Court's prior order, all 84 groups of emergency legislation were illegally enacted, and now subject to challenge."). Retroactive application would work a substantial inequity against the District by opening it up to potentially enormous liability and severely upsetting its settled fiscal expectations. Against that potential liability we must balance the harm done to appellants by the District's failure for a limited period of time to enact certain legislation through the proper procedural methods. We find, when we "weigh the inequity imposed by retroactive application," that it supports the district court's decision to apply *Washington Home Ownership Council* prospectively. We therefore join both the district court and the D.C. Court of Appeals in finding that the emergency acts regulating conversion in the District were fully binding through August 28, 1980.

### E. *The Unlawful Delegation Claim*

■ Appellants' final claim in this suit is that the District's entire tenant-consent conversion procedure violated their due process rights because it impermissibly delegated governmental authority to private citizens. The provision that the appellants challenge is the tenant-election section of the Rental Housing Conversion and Sale Act of 1980, D.C.Law 3–86, *codified in* D.C.Code §§ 45–1601 et seq. That provision permits condominium or cooperative conversion provided over 50 percent of eligible tenants vote for conversion in a tenant election. *Id.* § 45–1612(i). We are aware that the District of Columbia Court of Appeals has recently held that the tenant consent provisions of the Rental Housing Conversion and Sale Act of 1980 are unconstitutional delegations of legislative authority. *See Hornstein v. Barry,* 530 A.2d 1177 (D.C.App.1987), *reh'g. en banc granted,* 537 A.2d 1131 (D.C.App.1988). Because the case interpreted the law in light of the U.S. Constitution, we need not defer to the opinion as a conclusion of local law. While we are bound by the United States Supreme Court's interpretation of the U.S. Constitution, *see, e.g., Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962) (stating that the Supreme Court is the "ultimate arbiter of the Constitution"), the absence of such authority requires us to make our own independent determination about the statute's constitutionality. In so doing, we cannot agree with either the reasoning or the conclusion of the D.C. Court of Appeals.

■ The Supreme Court has long held that a municipality may prohibit a disfavored use of property but permit private citizens to waive that prohibition and consent to the use. *See Thomas Cusack Co. v. Chicago,* 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917). Appellants would have this court adopt an unduly restrictive standard of permissible government regulation. Concededly, the Court has held that some delegations of governmental authority to private citizens go so far as to violate due process. *See, e.g., Eubank v. City of Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912); *Washington v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928). But in other cases the Court has upheld such delegations against due process challenges. *See, e.g., Cusack, supra; New Motor Vehicle Board of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978). In order for a legislative delegation to private citizens to survive a due process challenge, the Court instructs that two criteria must be satisfied. First, the underlying exercise of authority must be a reasonable regulation within the power of the government. *Cusack,* 242 U.S. at 528, 37 S.Ct. at 190. Second, the legislature's restriction must be in the form of a general prohibition, and the delegation must be in the form of permitting private citizens to waive the protection of that prohibition. *Id.* at 531, 37 S.Ct. at 192 (upholding a regulation that "absolutely prohibits

the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification."); *see also Eastlake v. Forest City Enterprises,* 426 U.S. 668, 678 n. 12, 96 S.Ct. 2358, 2364, n. 12, 49 L.Ed.2d 132 (1976) (stating that "[s]ince the property owner could simply waive an otherwise applicable legislative limitation, the Court in *Cusack* determined that the provision did not delegate legislative power at all.").

Both of these conditions are met by the tenant-election law that appellants challenge. First, the statute is a valid use of the District's police power. The interest of a municipality in the conversion of its apartment stock to condominiums and cooperatives cannot be gainsaid. The state has a legitimate interest in assuring the availability of adequate housing. *Cf. Eisen v. Eastman,* 421 F.2d 560, 567 (2d Cir.1969) (upholding against constitutional challenge "[t]he New York City Rent Control Law [which] contains an impressive recital of the conditions deemed to call for its enactment ...."). The statutes at issue in the case at bar were enacted to prevent tenants in rental housing from being displaced due to cooperative and condominium conversions. As the tenant-election statute that appellants challenge states, it was designed "[t]o discourage the displacement of tenants through conversion or sale of rental property, and to strengthen the bargaining position of tenants toward that end without unduly interfering with the rights of property owners to the due process of law ...." D.C.Code § 45–1602(1).

The statute meets the second prong of the *Cusack* test as well. A statute survives due process challenge on this ground if it enacts a general prohibition and then delegates to private citizens the authority to waive that prohibition. As the Supreme Court has stated, "[a]n otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection." *New Motor Vehicle Board,* 439 U.S. at 109, 99 S.Ct. at 411. The conversion statute at issue in this case fits this model. Its tenant election provision is

phrased as a blanket prohibition that can be overcome through a tenant election. *See* D.C.Code § 45–1611(a)(1) (stating that "[a]n owner shall not convert a housing accommodation into a condominium or cooperative until the Mayor certifies compliance with the provisions of this subchapter regulating conversions ...."). The statute challenged by appellants meets the requirements laid down by the Supreme Court in *Cusack* and therefore must withstand the due process challenge.

## III. CONCLUSION

As the long history of appellants' conversion efforts suggests, the District of Columbia's actions in the conversion application at issue in this litigation may at times have been less than exemplary. Nevertheless, nonexemplary governmental administrative actions do not automatically rise to the level of due process violations. Whatever the confusion and delay, the District was in pursuit of a legitimate governmental interest: it sought to act with sufficient deliberation and care to protect both the right of building owners to a reasonably speedy conversion process and the right of tenants to remain in their rental homes until it has ascertained that the conditions of the conversion statutes had been met. We find that the District's actions did not deprive appellants of their constitutional rights. We also find appellants' due process and Home Rule Act challenges to the statutes at issue in this case to be without merit. The decision of the district court is

*Affirmed.*