# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 17, 2015          Decided July 10, 2015

No. 14-5059

FERNANDO ZEVALLOS,
APPELLANT

v.

BARACK HUSSEIN OBAMA, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00390)

---

*Erich C. Ferrari* argued the cause and filed the briefs for appellant.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*:

Appellant Fernando Zevallos brought suit challenging the determination of the Department of the Treasury that the President had lawfully designated him a significant foreign narcotics trafficker. The district court rejected his claims, as do we.

I

This case arises under the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1901 *et seq.*, one of several statutory mechanisms that enable the President to block or seize the assets of individuals or entities involved in international crime or terrorism. The Kingpin Act was modeled on a specific, successful application of a similar statute, the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-07. *See* H.R. Rep. No. 106-457, 42 (1999). IEEPA itself is closely analogous to the anti-terrorism provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 8 U.S.C. § 1189 (AEDPA). Under all three statutes, the President can designate individuals or entities as posing a threat to the security of the United States or its interests and impose sanctions on them.

The Kingpin Act specifically targets persons that "play[] a significant role in international narcotics trafficking," 21 U.S.C. § 1907(7), as "significant foreign narcotics traffickers," *id.* § 1903(b). Narcotics trafficking includes producing, distributing, selling, financing, or transporting any illegal narcotic, or conspiring with or assisting others to do so. *Id.* § 1907(3). Persons designated as significant foreign narcotics traffickers under the Kingpin Act—just like persons designated a threat to the United States under IEEPA and AEDPA—are added to the "Specially Designated Nationals

and Blocked Persons List," 31 C.F.R. § 501.807(a), and all their assets in the United States or under the control of any person who is in the United States are "block[ed]," 21 U.S.C. § 1904(b), or effectively frozen. No citizen or resident of the United States may transact or deal in blocked property. *Id.* § 1904(c).

A designated person may "seek administrative reconsideration" of his designation and request to be removed, or "delist[ed]," from the Specially Designated Nationals and Blocked Persons List. 31 C.F.R. § 501.807. The same procedure applies irrespective of which statute was invoked to designate the person in question. 31 C.F.R. Ch. V, App. A; *id.* § 501.807. A request for reconsideration—also sometimes called a delisting request—may include arguments or evidence rebutting Treasury's "basis . . . for the designation," or "assert that the circumstances resulting in the designation no longer apply." *Id.* § 501.807, 807(a). In other words, the designated person must argue that whatever rationale led Treasury to designate him under the appropriate statute—as relevant here, that the designated person was a significant foreign narcotics trafficker as defined in the Kingpin Act—was never true or is no longer true. The Office of Foreign Assets Control at the Department of the Treasury will "conduct[] a review of the request for reconsideration" and "provide a written decision to the blocked person." *Id.* § 501.807(d). A designated person can request delisting as many times as he likes. *See id.* § 501.807.

Petitioner Fernando Zevallos is a Peruvian national who founded and led Aero Continente, a low-cost airline operating throughout Latin America. A number of countries, including the United States, investigated Zevallos for alleged involvement in narcotics trafficking throughout the 1980s and 1990s. Peru's investigations culminated in a 1997 indictment

of Zevallos on drug trafficking and money laundering charges based on allegations that he had worked with drug traffickers to launder some $40 million.

In June 2004, President George W. Bush used his authority under the Kingpin Act to designate Zevallos as a significant foreign narcotics trafficker. Accordingly, all of Zevallos's assets in the United States and the assets of related companies and individuals were blocked. Around the time he was designated, Zevallos attempted to illegally transfer property he owned in Miami to his wife. He was eventually charged in the Southern District of Florida with violating the Kingpin Act by attempting this transfer. Those charges are still pending.

In December 2004, Zevallos asked Treasury to remove him from the Specially Designated Nationals and Blocked Persons List and unblock his assets. He submitted to Treasury a memorandum with exhibits in support of his request (the 2004 Memorandum). Treasury responded in June and September 2005 by disclosing non-sensitive material relating to Zevallos's designation. Zevallos filed a supplemental submission reiterating his arguments one month later.

Zevallos brought suit in November 2005 in federal district court in the District of Columbia, seeking an order that would require Treasury to take his name off the Specially Designated Nationals and Blocked Persons List and unblock his assets. However, shortly thereafter, Zevallos was convicted on all pending charges in Peru. He voluntarily dismissed his pending lawsuit against Treasury two days after his conviction, terminating that litigation. Treasury has since explained to Zevallos and to us that the agency interpreted Zevallos's dismissal of his lawsuit as a sign that he was abandoning his request for delisting, though Treasury did not

tell this to Zevallos at the time. At some point thereafter, Treasury lost the exhibits Zevallos had submitted with the 2004 Memorandum. Those exhibits have never been found.

Zevallos began serving a twenty-year prison sentence in Peru in 2005. He remains in prison in Peru today. Four years passed with no communication between Zevallos and Treasury. Zevallos broke this silence in July 2009 when he wrote to various U.S. officials, requesting extradition from Peru so that he could face the charges pending against him in the Southern District of Florida. Treasury construed this letter as a request for the agency to reexamine Zevallos's designation and wrote back, asking Zevallos to answer a questionnaire about his financial interests and relationship with a variety of entities and individuals. Zevallos filed a response to that questionnaire in November 2009.

Another four years passed with no action from Treasury on Zevallos's resuscitated delisting request. In March 2013, Zevallos filed this action, seeking an injunction that would force Treasury to act on his long-pending delisting request. Three months later Treasury at last denied the request. Treasury acknowledged losing the exhibits attached to Zevallos's 2004 request, but tried to make up for this mistake by assuming that whatever Zevallos said about this evidence in his 2004 Memorandum was true. Even so, Treasury concluded that Zevallos was properly designated in 2004 and that he should remain designated in 2013. Treasury also produced a number of new pieces of evidence in support of the designation.

In response, Zevallos amended his complaint in this action to introduce new claims attacking Treasury's decision. Relevant to this appeal, Zevallos argued to the district court that the denial of his delisting request was arbitrary and

capricious and that Treasury had disregarded agency procedures. He also maintained that Treasury's decision should be reviewed de novo. Separately, Zevallos argued that his designation violated his procedural and substantive due process rights under the Due Process Clause.

Treasury insisted that the district court should use the APA's conventional arbitrary and capricious standard, not de novo review. Treasury also asked the district court to dismiss or grant summary judgment as to every count of Zevallos's amended complaint. The district court held in Treasury's favor on each point. *See Zevallos v. Obama*, 10 F. Supp. 3d 111, 119-33 (D.D.C. 2014).[1]

Zevallos timely appealed. We have jurisdiction under 28 U.S.C. § 1291. We consider the district court's ruling de novo. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). As always, when we examine an agency's decision, we apply the APA's "highly deferential standard," meaning that we may set aside Treasury's action "only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 732 (quoting 5 U.S.C. § 706(2)(A)); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 161 (D.C. Cir. 2003). Under that standard, "we may not substitute our judgment for [Treasury's], but we will require it to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and

---

[1] Zevallos also argued that the denial of his delisting request violated the APA because of undue delay and because blocking his assets violated the Takings Clause of the Fifth Amendment. The district court dismissed these claims, finding that the undue delay claim was now moot and that only the Court of Federal Claims would have jurisdiction to consider his Takings Clause claim. *See Zevallos*, 10 F. Supp. 3d at 123-24, 132-33. Zevallos does not appeal either of those rulings here.

the choice made.'" *Islamic Am. Relief Agency*, 477 F.3d at 732 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Zevallos asks us to take the extraordinary and rare step of reviewing Treasury's determination de novo instead of under the APA's arbitrary and capricious standard. *See* Melissa F. Wasserman, *Deference Asymmetries: Distortions in the Evolution of Regulatory Law*, 93 TEX. L. REV. 625, 639 n.44 (2015) (finding only one example where a court applied de novo review under the APA, in an unusual case in which the agency decisionmaker had obvious bias against the petitioner). We will not do so. We have never applied de novo review in an APA case and have stated in dicta that "procedures must be severely defective before a court proceeding under the APA can substitute de novo review for review of the agency's record." *Nat'l Org. for Women v. Social Sec. Admin.*, 736 F.2d 727, 745-46 (D.C. Cir. 1984) (Mikva & McGowan, JJ., concurring). These proceedings were not severely defective. The agency's fact-finding procedures were adequate, and Zevallos had ample opportunity to make his case to agency officials. *See id.* Therefore arbitrary and capricious review will apply.

## II

### A

We affirm the district court's rejection of Zevallos's claim that Treasury's denial of his delisting request was arbitrary and capricious.

Treasury denied Zevallos's delisting request by relying on five different sets of evidence: (1) newspaper articles discussing the recent seizure of assets he continued to control

in Panama; (2) newspaper articles discussing new charges filed against him in Peru in 2011 and 2012; (3) newspaper articles discussing his ongoing control of assets in Peru; (4) newspaper articles discussing the recent discovery of an illicit cellphone and memory stick in his prison cell in Peru; and (5) his 2007 criminal indictment in the Southern District of Florida.

Zevallos argues that Treasury is not entitled to rely on "[u]nverified open source materials" like news media reports to justify designation decisions under the Kingpin Act. However, as Zevallos acknowledges, we have approved the use of such materials as part of the unclassified record supporting the decision to designate an individual or entity for inclusion on the Specially Designated Nationals and Blocked Persons List under closely analogous statutes. *See, e.g.*, *Holy Land*, 333 F.3d at 162 (explaining that, under IEEPA, "it is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations"); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 19 (D.C. Cir. 1999) (noting that "nothing in [AEDPA] restricts [the Department of State] from acting on the basis of third hand accounts, press stories, material on the Internet[,] or other hearsay regarding the organization's activities").[2] There are good reasons to permit Treasury to rely on such materials that apply equally in all these contexts. The designation decision may be based in part on classified information. Treasury may face logistical or

---

[2] Though elsewhere Zevallos argues that our past decisions examining closely related statutes like IEEPA and AEDPA cannot help guide our assessment of the Kingpin Act, *see infra* at 15, he did not make that argument in this regard. To the contrary, his brief acknowledged the relevance of those cases here. As Zevallos has not argued to the contrary, we will assume our precedents under IEEPA and AEDPA provide useful guidance on this score.

political difficulties obtaining judicial or law enforcement records from other countries. Diplomatic concerns may limit what Treasury or its agents can say publicly in connection with individual designations. And the safety of investigators or informants might be put at hazard were their testimony made available as part of the administrative record. Those same considerations apply with equal force here. We see no reason to disapprove the use of such materials in delisting proceedings under the Kingpin Act when we have approved their use in nearly identical circumstances.

Zevallos suggests instead that relying on open source materials was inappropriate here because Treasury gathered the articles immediately before deciding his delisting request and therefore lacked adequate time to develop a more complete record that corroborated their content. But our previous IEEPA and AEDPA decisions approved the use of media reports to support a designation decision without regard to the recency of those reports or the presence of corroboration. *See, e.g.*, *Holy Land*, 333 F.3d at 162.

Zevallos also argues that the news reports on which Treasury relied do not support its determination. To the extent he has preserved his arguments, they fail; where they have been forfeited, we do not consider them. Treasury relied in part on articles revealing the discovery of an illicit cellphone and memory stick in Zevallos's jail cell, as well as articles discussing the use of such devices by incarcerated drug traffickers to continue managing their affairs. Zevallos points out that the Kingpin Act only permits designating an individual who "plays a significant role" in narcotics trafficking, not someone who merely has the capacity to do so. *See* 21 U.S.C. § 1907(7). Evidence that he possessed an illicit cellphone in prison, he argues, does not show that he used that cellphone to participate in narcotics trafficking. Fair

enough. Perhaps these articles, standing alone, might not have provided enough to justify Zevallos's designation. But this evidence at a minimum shows that Zevallos had the capacity to communicate with others outside his prison. And Zevallos does not argue that Treasury could not rely on this evidence in combination with other evidence of illegal activity to conclude that he still represents a threat and should remain designated.

And there was no shortage of additional evidence. For example, Treasury relied on a set of articles discussing the seizure of Panamanian bank accounts that Zevallos continued to control from prison through his sister, as well as another set of articles discussing his family's ongoing control of a number of properties in Peru that were ostensibly seized by the Peruvian government years ago in connection with Zevallos's conviction. Zevallos argued below that this evidence was irrelevant because it showed only that his family continued to control assets derived from narcotics trafficking. On appeal he argues that Treasury may not rely on evidence that he owns such assets because he cannot legally or practically relinquish control of them, given that they are blocked under the Kingpin Act and that he is incarcerated. Because these arguments were not made below, they have been forfeited. *See Potter v. District of Columbia*, 558 F.3d 542, 549-50 (D.C. Cir. 2009). But even if not forfeited, they miss the point. Treasury does not fault Zevallos for nominally owning assets he is somehow obstructed from abandoning.[3] Instead, Treasury relied on this evidence, as it was entitled to

---

[3] It is by no means clear that Zevallos is correct that any legal or practical impediment would prevent him from abandoning any assets. But we need not decide that question because his ability to abandon bank accounts or other property is irrelevant to Treasury's decision to continue his designation.

do, to show that Zevallos remains in contact with his family and continues to manage his assets from prison.

Treasury also pointed to articles reporting new charges filed against Zevallos in Peru in 2011 and 2012 alleging more recent money laundering activity. Zevallos did not address this evidence at all except as part of his categorical argument that Treasury should not have relied on any news reports. But as we explained above, Treasury was entitled to rely on evidence of this kind to conclude that Zevallos remains of concern to law enforcement.

Finally, Zevallos argues that Treasury should not have considered his 2007 criminal indictment. He made no argument at all regarding the 2007 indictment below and so he has forfeited any argument he might make on appeal on this score. *See Potter*, 558 F.3d at 549-50.

All this evidence together provides adequate basis to justify Treasury's determination. There is no doubt, as Zevallos argues, that Treasury marshalled less evidence now than existed to support his original designation in 2004. And we agree that much of this evidence could be viewed in a light more beneficial to Zevallos. However, when we evaluate agency action, "we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted). Under that deferential standard, we find that this record supports Treasury's denial of Zevallos's delisting request.

B

Zevallos argues that Treasury reached the decision to deny his request "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). His claim rests on two grounds. He criticizes the agency for losing the exhibits he submitted in support of the 2004 Memorandum as part of his original delisting request. He also asserts that the agency should have notified him that dismissing his lawsuit in 2005 would, in Treasury's view, also effectively withdraw his delisting request.

We will not invalidate Treasury's decision based on procedural error unless the errors alleged could have affected the outcome. *See Ozark Auto. Distributors, Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) ("'In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.'" (quoting *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004)). Zevallos has failed to argue that either error was anything more than harmless. First, though losing the binders full of evidence Zevallos submitted in 2004 was without question a serious error, Treasury remediated that mistake by assuming that everything Zevallos said about what was in the missing evidence was true. Zevallos insists nonetheless that Treasury "arguably would have reached a different conclusion" had the agency reviewed the actual evidence instead of accepting his word for what the evidence showed. We fail to see how. The evidence would either have supported or contradicted the factual claims Zevallos made in the 2004 Memorandum. If the former, Zevallos would have been no better off because Treasury already assumed everything he said about the evidence was true. On the other hand, he would have been much worse off if examining the evidence showed that Zevallos had lied about what it showed. Because Zevallos cannot show any injury from the loss of his evidence, this error provides no basis to invalidate Treasury's determination.

Nor has Zevallos suggested that he was harmed by the long delay after Treasury interpreted Zevallos's request as withdrawn in 2005. To be sure, Treasury should notify individuals when disregarding their pending requests. And Zevallos is correct that no statute or regulation allows Treasury to disregard pending requests, as happened here. But Zevallos must show that a different process would have led Treasury to a different decision. He has not done so. Though Treasury took a long time, the agency ultimately considered and denied the delisting request. Zevallos was designated as a significant foreign narcotics trafficker in 2004. He remained so designated for the next eight years. He is still so designated today. Nothing would have changed had Treasury denied his delisting request in 2006 or 2010. Zevallos insists that the delay harmed him because his ongoing designation imposed serious burdens on him and his family. But Zevallos has not and cannot argue that he would have avoided that harm had Treasury made its decision earlier. Therefore any error on this score is harmless as well.

Finally, we note that any discussion of procedural error in this context is academic. Even if Zevallos proved a procedural error sufficient to invalidate Treasury's decision, at most we would vacate Treasury's determination and remand for Treasury to rule again. But Treasury's procedure governing requests for reconsideration of designation decisions imposes no limit on the number of times a designated person can request delisting. *See* 31 C.F.R. § 501.807. Zevallos is free to file a new request and obtain a new ruling from Treasury, just as he would if we vacated and remanded the decision before us. In fact, it seems Zevallos has already taken advantage of this procedure. He filed another delisting request with Treasury after he noticed this appeal, which the agency has held in abeyance while this matter is pending. If anything,

Zevallos is better off for having read Treasury's 2013 decision. He now knows all of Treasury's newest and best arguments justifying his ongoing designation and can respond to them in a future request for reconsideration.

C

Zevallos also insists that Treasury violated his procedural and substantive due process rights under the Constitution. He faults Treasury for failing to afford him the chance to challenge his designation beforehand and for providing inadequate process to challenge his designation after the fact. And he argues that denying his delisting request was so gravely unfair as to infringe his substantive due process rights. He is wrong on all counts.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Though the Due Process Clause generally requires the Government to afford individuals notice and an opportunity to be heard before depriving them of their property, there are "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). This is especially true where the seizure is aimed at "property . . . of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974). In that circumstance, "[t]he ease with which an owner could frustrate the Government's interests in the forfeitable property

create[s] a 'special need for very prompt action' that justifie[s] the postponement of notice and hearing until after the seizure." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993) (quoting *Calero-Toledo*, 416 U.S. at 678).

This is just such a case. There is no doubt that blocking Zevallos's assets deprived him of his property. But providing notice before blocking the assets of international narcotics traffickers would create a substantial risk of asset flight. Just as in *Calero-Toledo*, that risk creates a "special need for very prompt action." 416 U.S. at 678. To say that offering predeprivation process in this circumstance would prove "impractical," *Gilbert*, 520 U.S. at 930, understates the case; such process would likely cripple the Kingpin Act.

The only response Zevallos offers is to critique the district court for relying on a line of cases under IEEPA that approved blocking assets without predeprivation process. Zevallos insists that the district court was wrong to employ IEEPA precedent. We need not decide whether he is right. The due process analysis here is straightforward without analogizing the Kingpin Act to any other statute. As we have explained, the circumstances of this case justified Treasury's decision to designate Zevallos and block his assets without affording him notice and the opportunity to be heard beforehand. *See Calero-Toledo*, 416 U.S. at 679.

Nor can Zevallos complain of the adequacy of the postdeprivation process he received. He was given notice and a meaningful opportunity to be heard, which is what the Due Process Clause requires. *Holy Land*, 333 F.3d at 163.[4]

---

[4] Though Zevallos insisted that IEEPA cases cannot provide any guidance for determining whether predeprivation process is required under the Kingpin Act, *see supra* at 15, his discussion of the adequacy of the

Treasury provided Zevallos several times with the unclassified evidence on which it relied to designate him; Zevallos not only had the chance to contest the propriety and adequacy of that evidence but did so on more than one occasion. And he remains free now to continue contesting his designation by filing new delisting requests, meaning that he can make any new arguments that occur to him and reiterate and expand any arguments he felt received short shrift on Treasury's last review. Due process does not require more.

Zevallos makes four equally deficient responses, two of which we consider and reject and two of which we do not reach because they have been forfeited. First, he complains that Treasury waited far too long before deciding his request and failed to communicate with him during these delays. True, other courts have held that extremely prolonged delays while considering such requests can violate the Due Process Clause. *See Al Haramain*, 686 F.3d at 985 (finding a due process violation when Treasury never produced the entire unclassified administrative record justifying a designation decision, explained only some of the reasons for the designation via a press release months later, and waited years to respond to a delisting request); *KindHearts*, 647 F. Supp. 2d at 905 (same, where Treasury only produced a "scanty," partial record thirty-four months after the designation). This case is quite different. Though Treasury took several years to decide Zevallos's request, Treasury did promptly provide

---

postdeprivation process he received is based almost entirely on three IEEPA cases: *Holy Land*, 333 F.3d at 163, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 984 (9th Cir. 2012), and *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 905 (N.D. Ohio 2009). Thus, as we did when discussing the permissibility of news media reports as a basis for designation decisions, *see supra* at 8 n.2, we will assume that Zevallos accepts the relevance of these cases on this question.

Zevallos with the unclassified administrative record justifying his designation and allowed him to respond to it on multiple occasions. Unlike the petitioners in *Al Haramain* and *KindHearts* who never fully understood why they had been designated, Zevallos was fully equipped to rebut Treasury's rationale by the time it finished disclosing information to him in September 2005. *Cf. Al Haramain*, 686 F.3d at 984-85 (finding that Treasury had violated due process by "refus[ing] to disclose its reasons for investigating and designating [the petitioner], leaving [the petitioner] unable to respond adequately to the agency's unknown suspicions"); *KindHearts*, 647 F. Supp. 2d at 904 (same, because the petitioner "remain[ed] largely uninformed about the basis for the government's actions"). Because Zevallos knew the basis for his designation, no comparable due process violation existed here. In any event, if there was error, it was harmless. We have already held that the administrative record supports Treasury's conclusion that Zevallos should remain designated, and Zevallos does not suggest that reviewing his delisting request at a faster pace would have changed that outcome.

Zevallos disagrees. He was harmed by Treasury's due process violations, he argues, because he has been forced to respond to his designation "in a post hoc manner" and "to decipher the administrative process by trial and error." There is no support for this claim in the record. Zevallos has known from the beginning how to attack Treasury's case against him. He has done so several times, and he can continue to do so now in new requests for delisting. Nothing about the history of this case suggests that Zevallos has been forced to stumble towards a moving target. And once again, because no procedural error Zevallos alleges played a role in the denial of his delisting request, none provides a basis to vacate Treasury's determination.

Second, Zevallos maintains that Treasury's loss of the binders of evidence he submitted with his original delisting request in 2004 prevented the agency from giving his argument a fair hearing. Again, we disagree. As we have already explained, Treasury rendered any arguable error harmless by simply accepting what Zevallos said about the missing evidence in his 2004 submission. Treasury's bumbling was no more harmful with respect to Zevallos's due process rights than it was under the APA's requirement that Treasury follow appropriate agency procedure.

Zevallos has forfeited his last two due process arguments. He argues that Treasury did not disclose the basis for continuing to designate him until the final decision regarding his delisting request issued in 2013. Because Zevallos had not previously seen this evidence, he insists he could not adequately contest his ongoing designation. Zevallos forfeited this argument by not raising it in the district court. *Potter*, 558 F.3d at 549-50. He also points to the questionnaire Treasury asked him to answer in 2009 once the agency realized he still wanted a decision on his delisting request, and complains that Treasury's 2013 decision did not address any of the topics about which the 2009 questionnaire inquired. This argument is doubly forfeited: Zevallos did not make it to the district court; and on appeal he made it for the first time in his reply brief. *See Russell v. Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014) (holding that arguments raised for the first time in a reply brief are forfeited).

Finally, Zevallos insists that Treasury's conduct violated his substantive due process rights. We have explained in the past that substantive due process forbids only "egregious government misconduct," *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003), involving state

officials guilty of "grave unfairness" so severe that it constitutes either "a substantial infringement of state law prompted by personal or group animus," or "a deliberate flouting of the law that trammels significant personal or property rights," *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988). "Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of [official] duties, do not" violate substantive due process rights. *Id.* Zevallos has not suggested misconduct even approaching this egregious standard. Any error Treasury committed was, at most, the result of mistake or negligence and, as we have pointed out repeatedly, was harmless. Thus we affirm the district court on this score as well.

Nor is it true, as Zevallos suggests, that his claims could only be adjudicated at a trial because we have not before examined designations under the Kingpin Act. Due process is a thickly forested field. Though the statute is new, the legal question is very old; and though Zevallos contests action taken under a statute we have not confronted until now, the deficiency in his claims arises from legal rules that apply equally to all statutes. The district court's decision was perfectly appropriate.

## III

For the foregoing reasons we affirm the district court.