Filed 12/19/23  O'Hara v. Liberty Rural County Fire Protection Dist. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| TIMOTHY O'HARA, | C096135, C097014 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCVUOE20180007115) |
| v. | |
| LIBERTY RURAL COUNTY FIRE PROTECTION DISTRICT et al., | |
| Defendants and Appellants. | |

Plaintiff Timothy O'Hara (O'Hara) was a firefighter with defendant Liberty Rural County Fire Protection District (the District).  He was terminated after more than 12 years of service by the District's fire chief, defendant Stanley D. Seifert (Seifert).

O'Hara sued the District and Seifert alleging violations of the Firefighters Procedural Bill of Rights Act (FPBOR) (Gov. Code, § 3250 et seq.), violations of due process under title 42 of the United States Code section 1983 (section 1983), and

1

defamation.[1]  A jury returned a special verdict finding Seifert intentionally and deliberately denied O'Hara due process of law and awarded more than $3 million in economic and noneconomic damages.  The trial court ordered an additional award of $1.3 million as a "tax neutralization gross up," and a civil penalty of $25,000 for violating the FPBOR.  (Gov. Code, §§ 3254, 3260, subd. (d).)  The trial court also awarded O'Hara nearly $600,000 in attorney's fees.  (42 U.S.C. § 1988 (section 1988); Gov. Code, § 3260.)

The District and Seifert appeal.  They concede they failed to follow the processes required by the FPBOR in terminating O'Hara.  Nevertheless, they argue O'Hara's section 1983 cause of action fails as a matter of law—and the trial court should have granted their motions for judgment notwithstanding the verdict—because O'Hara failed to exhaust available state law remedies.  The District and Seifert also challenge the civil penalty, elements of the economic and noneconomic damage awards, and the attorney's fee award.  We will reject these contentions and affirm the judgment.

## I.  BACKGROUND

The District provides fire protection services to a small, mostly rural area within San Joaquin County.  Seifert has served as the District's fire chief for 44 years.  O'Hara joined the District as a shift supervisor in 2005.[2]

---

[1] The FPBOR "provides firefighters with certain rights concerning their employment" (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384), including enhanced due process protections.  (Gov. Code, § 3260.)

[2] A command hierarchy common to many fire departments begins with the lowest rank of firefighter, then proceeds to engineer (the person who operates the fire engine), then captain (the person who runs the station and develops firefighting plans), then battalion chief (someone who supervises more than one fire station), then fire chief.  O'Hara testified that his responsibilities as a shift supervisor were similar to those of a captain.

2

*A.    O'Hara's Employment with the District*

Seifert and O'Hara worked well together for many years. But the relationship started to sour in 2012, when Seifert's granddaughter asked O'Hara to serve chili at her graduation party. Afterwards, Seifert summoned O'Hara to his office and warned: " 'Just because you did a nice thing doesn't mean you get a free pass around here,' " and " 'Don't get comfortable.' " Sometime later, Seifert started telling O'Hara to look for another job.

Things went from bad to worse in 2015 or 2016. Seifert began placing letters of reprimand in O'Hara's personnel file. One such letter accused O'Hara of inappropriately instructing an off-duty employee to seek medical attention for an accidental needlestick before returning to work. Another accused O'Hara of engaging in an altercation with another firefighter. Still another accused O'Hara of failing to reroll hose packs and clean an engine upon returning to the fire station after a deployment. O'Hara, who denies any wrongdoing, was not given an opportunity to appeal the letters of reprimand. (Gov. Code, §§ 3254, subd. (b), 3254.5.)

The relationship deteriorated still further in October 2016, when Seifert purported to place O'Hara on probation for twelve months.[3] O'Hara objected to the attempted discipline but was not given an opportunity to pursue an administrative appeal. (Gov. Code, §§ 3254, subd. (b), 3254.5.) Seifert also froze O'Hara's pay, blocked him from participating in strike teams (which provided additional income), and refused to certify him as a strike team leader (which would have involved an increase in pay).[4] He then

---

[3] Seifert could not really place O'Hara on probation because he was by then a permanent employee. (See generally *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 206-207 (*Skelly*).)

[4] Strike teams are groups of engines that have been dispatched by the Office of Emergency Services to fight wildland fires.

purported to extend O'Hara's "probation" by six months. As before, O'Hara objected but was not given an opportunity for an administrative appeal. (*Ibid.*)

With tensions mounting, O'Hara applied for a captain's position with the Waterloo-Morada Fire District (Waterloo-Morada) in November 2017. He passed a written test and cleared an assessment panel in February 2018. He was then invited to interview with Waterloo-Morada's fire chief, Steve Henry, and the battalion chiefs. At the end of the interview, O'Hara was told that Waterloo-Morada would be filling three positions right away, and maintaining a hiring list for a fourth position, which was expected to be opening soon. O'Hara was first on the list for the anticipated vacancy.

Several days later, O'Hara learned that an anonymous letter had been circulating through fire departments in San Joaquin County. The letter was addressed to the "Hiring Manager" and "all concerned parties that do the hiring at your station." It read, in part: "There has been some rumors going around that a Mr. Timothy O'hara [*sic*] has been asked to leave his current station by his Chief Stanley Seifert for reasons unknown at this time. [¶] But, we do know that Mr. O'hara [*sic*] has had lots of issues with many of his co-workers. Many of his co-workers have left the station because of him." The letter warned that O'Hara "has a huge attitude problem" and "lots of old injuries that cause him issues and he may not be able to perform duties as asked." The letter closed by urging readers to "be careful in your decision if he has applied to your station." It was signed, "All concerned firefighters."

O'Hara called Seifert on the phone. Seifert said he had heard about the letter from another fire chief and understood that copies had been sent to other fire departments. Seifert characterized the contents of the letter as "bullshit," stating: "Despite our differences, you don't deserve this."

In the weeks that followed, O'Hara became aware of rumors that he had been fired. He called Seifert and said, " 'Hey, I can't go anywhere around here without somebody telling me I'm getting fired.' " Upset, O'Hara added, " 'You know . . . I got

4

some friends that think you wrote that letter.' "  Seifert took offense to the accusation, and the conversation became heated.  The call ended with O'Hara hanging up on Seifert.

O'Hara was off duty for the next several days.  When he returned to the District, Seifert called O'Hara to his office and said, " 'Well, Tim, it's come down to this:  You either quit or you're fired.' "  O'Hara replied, " 'I'm not going to quit.' "  Seifert then handed—or "threw"—O'Hara a letter.  The letter, which was signed by Seifert and dated March 18, 2018, stated, in part:  "This letter is to inform you that you no longer meet the expectations of the Liberty Fire District.  You are immediately released from duty."  Neither Seifert nor the letter said anything about O'Hara's rights under the FPBOR.  (Gov. Code, §§ 3254, subd. (b), 3254.5.)  O'Hara returned his equipment and left the District in a state of shock.

A couple of weeks later, O'Hara received a telephone call from one of the battalion chiefs at Waterloo-Morada.  The battalion chief said another captain's position was opening and asked whether O'Hara was still interested.  O'Hara responded that he was, but there had been a change in his employment status.  He then disclosed that he had been terminated.  A short time later, O'Hara received a letter from Chief Henry saying Waterloo-Morada would not be filling the captain's position after all.

O'Hara filed a notice of claim in April 2018.  The notice of claim alleged that Seifert and the District terminated O'Hara's employment without due process in violation of the FPBOR and sought reinstatement with full backpay and benefits.  Neither Seifert nor the District responded.

B.    *The First Amended Petition and Complaint*

O'Hara commenced the present action in June 2018.  The operative first amended petition and complaint alleges O'Hara was a permanent employee at the time of his termination, and Seifert and the District intentionally and maliciously violated the FPBOR by terminating him without due process.  (Gov. Code, §§ 3254, subd. (b), 3254.5.)  The first amended petition and complaint seeks a traditional writ of mandate

5

compelling the District to comply with the FPBOR and reinstate O'Hara with backpay and benefits from the date of his dismissal.  (Code Civ. Proc., § 1085.)  The first amended petition and complaint also asserts causes of action for violations of section 1983 based on a deprivation of due process, violations of the Bane Act (Civ. Code, § 52.1), defamation (based on the anonymous letter), violations of the FPBOR (Gov. Code, §§ 3254 and 3254.5), and negligence.  In addition to writ relief, the first amended petition and complaint seeks civil penalties under the FPBOR (Gov. Code, § 3260, subd. (d)), compensatory and punitive damages, and attorney's fees (§ 1988(b)).

The case narrowed in the lead-up to trial.  O'Hara voluntarily dismissed the Bane Act cause of action.  Seifert and the District then moved to bifurcate trial on the petition for writ of mandate and causes of action for violations of the FPBOR and section 1983 from the defamation and negligence causes of action.[5]  O'Hara opposed the motion. Among other things, O'Hara indicated that he would not be pursuing the petition for writ of mandate or seeking equitable relief under the FPBOR.  However, O'Hara was careful to say he was not dismissing the cause of action for violations of the FPBOR.  The trial court denied the motion to bifurcate.[6]  The trial court subsequently dismissed the negligence cause of action.  That left O'Hara with causes of action for defamation, violations of section 1983, and violations of the FPBOR.

C.    Trial

The causes of action for defamation and violations of section 1983 were tried to a jury in October and November 2021.  It was undisputed that O'Hara had successfully completed 12 months of probation and had a protected property interest in continued

---

[5] In the alternative, Seifert and the District sought to bifurcate trial on the petition for writ of mandate and cause of action for violations of the FPBOR from all remaining causes of action.

[6] As we shall discuss, the question of the civil penalty was tried to the trial court.

employment with the District.  (See generally *Skelly, supra,* 15 Cal.3d at pp. 206-207.)  It was also undisputed—indeed, conceded—that Seifert and the District failed to comply with the FPBOR's due process requirements in terminating him.

The FPBOR forbids punitive action "against any firefighter who has successfully completed the probationary period without providing the firefighter with an opportunity for administrative appeal."  (Gov. Code, § 3254, subd. (b); see also Gov. Code, § 3251, subd. (c) [" 'Punitive action' means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment"].)  As relevant here, the FPBOR required that Seifert and the District give O'Hara an opportunity to respond to adverse comments in his personnel file (Gov. Code, §§ 3255, 3256), and appeal punitive actions on grounds other than merit (Gov. Code, § 3254, subd. (b)).  This they failed to do.

Seifert and the District also conceded that the anonymous letter was defamatory. Seifert and other defense witnesses agreed that O'Hara was an "excellent firefighter," and the letter's contrary suggestion was false.  Indeed, Seifert repeatedly characterized O'Hara as his "best firefighter."  Another defense witness testified, "Mr. O'Hara is a great firefighter and honestly, if I had to go in a burning building, with me today I'd probably take him with me."[7]

Given these concessions, the evidence at trial naturally focused on other issues. Both sides spent substantial time on Seifert's familiarity (or lack thereof) with the FPBOR and whether the violations of O'Hara's due process rights were deliberate or intentional.  Both sides also spent considerable time on the question of whether Seifert authored the anonymous letter.  As we shall see, the jury found Seifert deliberately

---

[7] Where O'Hara fell short, defense witnesses said, was in tending to non-emergency duties around the fire station.

7

flouted the FPBOR and intentionally denied O'Hara due process but was not responsible for writing or sending the letter. We need not recount this evidence in specific detail, however, as neither side challenges these findings. We instead focus on evidence pertaining to O'Hara's damages.

O'Hara testified that Seifert runs the District as his personal fiefdom. He explained that some of Seifert's relatives work for the District and suggested they have received undeserved promotions and/or special consideration due to nepotism. He implied Seifert wanted him to leave the District to make room for family members. When O'Hara refused to resign, Seifert set out to drive him from the District and destroy his career.

O'Hara said he thought the anonymous letter came from within the District. He noted the author seemed to have inside knowledge (e.g., that he had been asked to leave and suffered from old injuries) and recalled that the person who told him about the letter also thought it was an "inside deal." O'Hara estimated the letter had been sent to 10 fire districts within San Joaquin County. O'Hara also said the letter had been discussed at a meeting of fire chiefs in San Joaquin County in 2018.

O'Hara acknowledged that Chief Henry was not aware of the letter at the time of the interview for the captain's position at Waterloo-Morada. Nevertheless, he suggested Seifert sabotaged his candidacy. Specifically, he opined that he would have received an offer from Waterloo-Morada had he not been terminated. Henry later confirmed O'Hara's opinion by testifying to much the same thing.[8]

---

[8] Chief Henry testified that O'Hara was fourth on the list of four for the captain's position at Waterloo-Morada. He explained that O'Hara performed well enough in the initial interview, but he was concerned about O'Hara's response to a question about conflict management. Despite this reservation, Henry indicated he would have hired O'Hara had he not been terminated (and assuming he passed a physical examination and performed well in a follow up interview).

Based on decades of experience in the fire service, O'Hara opined he has no realistic chance of ever getting another firefighter's position. He testified he would have to compete with an applicant pool of "thousands" of younger, more vigorous candidates for any entry-level position and, at 51 years old, the odds of him outperforming them in physical agility tests (as he would be required to do) were "[n]ext to nil." Consequently, O'Hara said, it was "literally impossible" for him to start over from the bottom.

O'Hara was equally pessimistic about his ability to make a lateral move. He observed that lateral opportunities are few and far between, and opined that he would have "three strikes" against him before even stepping to the plate: the anonymous letter (which he believed to have been widely circulated), the fact of his termination (which he said he was obliged to disclose), and the instant lawsuit (which he anticipated would come up in any background check). Together, O'Hara said, these circumstances pose an insurmountable obstacle to him ever finding another fire service job. He does not believe any hiring manager would be likely to take a chance "on somebody that's been terminated, in a lawsuit, and then add the defamatory letter on there." Thus, he concluded: "My career has been destroyed. Nobody is going to take me."

O'Hara testified he has only applied for one firefighting job since his termination: an engineer's position with the Lathrop Manteca Fire Protection District (Lathrop Manteca) in October 2018. O'Hara explained that he completed the testing and interview process and was placed on a hiring list (as number 10 or 11 of 14), but the list expired. O'Hara has not applied for any other firefighting positions. He has sought reinstatement from the District, he said, but the District has refused to reinstate him or give him due process.

O'Hara testified that the loss of his career has felt like "a part of my soul being cut out of me." He has a hard time sleeping, and constantly ruminates about his career ending. O'Hara's wife, Denise, testified that O'Hara loved being a firefighter, and considered it a calling. Denise explained that O'Hara's career as a firefighter was "gone"

9

the day he was fired, and now, "for lack of better words, it's dead. It's gone." As a result, Denise said, O'Hara has been "grieving the loss of his career." Denise observed that O'Hara suffers from pervasive feelings of worthlessness and powerlessness.

Seifert testified as an adverse witness under Evidence Code section 776 and as part of the defense case. Seifert said O'Hara routinely neglected stationhouse duties, such as cleaning and checking equipment. He insisted he only took O'Hara to task for serious infractions, which he documented in the letters of reprimand. However, he acknowledged that he lacked authority to place O'Hara on probation. Seifert said he only purported to place O'Hara on probation to motivate him to be more conscientious around the fire station.

Seifert testified he wanted to work with O'Hara to improve his performance. But he also acknowledged discussing the possibility of terminating O'Hara with California Employers Association (CEA), a membership-based trade association that provides human resources support to the District.[9] By February 2018, Seifert said, CEA had reviewed O'Hara's personnel file and agreed that it reflected a pattern of progressive discipline that supported termination. According to Seifert, CEA said nothing about the need to respect O'Hara's due process rights under the FPBOR.[10]

Although he acknowledged laying the groundwork for terminating O'Hara in February 2018, Seifert testified he did not decide to do so until March 2018, when O'Hara called to confront him about the anonymous letter. Seifert recalled that O'Hara accused him of writing the letter and losing control of the District. According to Seifert,

---

[9] Seifert explained that the District is too small to support its own human resources staff.

[10] A former CEA employee testified that Seifert characterized himself as an "expert" on the FPBOR and asserted the statutory scheme did not apply because O'Hara was on probation. Another CEA employee testified that Seifert acknowledged discussing the FPBOR with the afore-mentioned former employee.

O'Hara's accusations and tone of voice demonstrated disrespect for the chain of command, leaving Seifert with no choice but to terminate O'Hara for insubordination. As noted, Seifert made no bones about the fact the termination violated O'Hara's rights under the FPBOR.

Seifert opined that O'Hara could not reasonably be reinstated, given his insubordination and the close working conditions necessitated by the District's small size. He added that reinstatement would have made little sense in any event, as O'Hara would have been terminated with or without process.

Seifert acknowledged he had the ability to provide O'Hara with process and the District's board of directors does not interfere with his personnel decisions. Robert Erman, a member of the board, confirmed that Seifert wanted O'Hara gone, and the board "just went along with that." Seifert acknowledged that O'Hara had been harmed by the violation of his due process rights, and Erman said the District was prepared to accept the consequences of the violation.

Craig Enos, a certified public accountant, testified for O'Hara as an expert on economic damages. Enos explained that he calculated O'Hara's economic damages using two scenarios. In the first scenario, Enos calculated what O'Hara would have earned had he remained in his position with the District for the rest of his working life.[11] In that scenario, Enos opined that O'Hara's total economic losses (including lost earnings and pension benefits) were $1,402,938. In the second scenario, Enos calculated how much O'Hara would have earned had he remained at the District until August 2018, started as a captain at Waterloo-Morada in September 2018, and remained in that position for the rest of his working life. In that scenario, Enos opined that O'Hara's total economic losses were $2,082,494.

---

[11] Enos assumed that O'Hara would have continued working until the age of 62.

Economist and vocational rehabilitation expert Mark Cohen testified for the District. Cohen testified that there had been more than 193 job postings for firefighters in and around San Joaquin County from March 2018 through the time of trial. He observed that O'Hara had applied for only one firefighting position and opined that such an effort was not consistent with a reasonable job search. Had he undertaken a reasonable search, Cohen said O'Hara would have been likely to obtain comparable employment within six to 12 months. Assuming he could have found comparable employment in six months, Cohen estimated that O'Hara's economic losses were $33,738. Assuming he could have found comparable employment in 12 months, Cohen estimated that O'Hara's economic losses were $78,827. As we shall see, the jury accepted O'Hara's damage calculations and rejected the District's.

### D. Verdict

The jury returned a special verdict on November 4, 2021. As noted, the jury found that Seifert intentionally or deliberately flouted the law by denying O'Hara due process. The jury further found that O'Hara proved by clear and convincing evidence that Seifert engaged in the conduct with an evil motive or demonstrated reckless indifference to O'Hara's constitutional rights. The jury further found that Seifert did not make a reasonable mistake as to what the law requires. As also noted, the jury found that Seifert did not author the anonymous letter.

With respect to causation and damages, the jury found that O'Hara was harmed by his dismissal from employment, and Seifert's dismissal was a substantial factor in causing harm to him. The jury awarded total damages of $3,107,507, an amount that consisted of $2,071,671 for economic losses ($325,436 for past lost earnings and $1,746,235 for future lost earnings) and $1,035,836 for noneconomic losses ($295,953 for past noneconomic loss and $739,883 for future noneconomic loss). The jury awarded no punitive damages.

*E. Tax Gross-Up Award*

O'Hara moved before trial for an upward adjustment of any judgment amount to offset the adverse tax consequences of a lump sum award of economic damages. The trial court conducted an evidentiary hearing on the tax consequences of the jury's economic damage award on November 17, 2021. At the hearing, O'Hara's damages expert, Enos, testified the lump sum award of $2,071,671 for past and future lost earnings would subject O'Hara to a marginal tax rate of 50.3 percent, resulting in an adverse tax consequence of $646,824.[12] Enos explained that O'Hara would need to receive an additional $654,633 to offset the adverse tax consequence of $646,824. Thus, Enos concluded, a gross-up of $1,301,457 ($646,824 plus $654,633) was necessary to make O'Hara whole.

The District responded that the requested tax gross-up was unauthorized and speculative.[13] The trial court rejected the District's arguments and entered an additional tax gross-up award of $1,301,457, which was incorporated into the judgment for O'Hara.

*F. FPBOR Civil Penalty*

As noted, O'Hara's first amended petition/complaint sought civil penalties of $75,000 under the FPBOR. (Gov. Code, § 3260, subd. (d) [authorizing civil penalties "not to exceed twenty-five thousand dollars ($25,000)" for acts taken by fire department employees that "maliciously" violate the FPBOR].) The trial court heard argument and issued a written decision finding that Seifert "knew about the [FPBOR] and completely

---

[12] Enos explained that O'Hara would be subject to a 37 percent federal tax rate, and a 12.3 percent California tax rate, plus an additional 1 percent for California's "mental health tax." Enos also explained that an "adverse tax consequence" equals the difference between the tax due on the lump sum and the tax that would have been due had the income been earned over the course of his life expectancy.

[13] Seifert and the District did not dispute Enos's mathematical calculations.

13

disregarded its provisions because he had a personal vendetta against [O'Hara]."[14] "Even after [the District] learned of it[s] errors in terminating [O'Hara]," the trial court continued, "it took no steps to rectify the issues and follow the [FPBOR]." Accordingly, the trial court concluded that O'Hara had shown by clear and convincing evidence that Seifert and the District maliciously violated the FPBOR and was entitled to a single civil penalty of $25,000 under Government Code section 3254, subdivision (d). That amount was also added to the judgment.

## G.    Posttrial Motions

Seifert and the District moved for judgment notwithstanding the verdict in January 2022. They argued the evidence was insufficient as a matter of law to support the verdict on the section 1983 cause of action because O'Hara failed to show he exhausted state law remedies under the FPBOR, and those remedies were inadequate. They also argued that the evidence was insufficient as a matter of law to support the award of a civil penalty under the FPBOR, because nothing in the record established that the penalty was accompanied by a request for equitable relief.

Seifert and the District also moved for a new trial or remittitur. They argued that the jury's award of economic damages was excessive, and the appropriate remedy for the deprivation of due process was a hearing on the merits of O'Hara's termination and reinstatement if the termination was found to be unjustified. Seifert and the District also argued economic damages should be limited to three to six months of backpay because O'Hara failed to mitigate damages, and noneconomic damages should have been limited to those caused by the process used to terminate him, rather than the termination itself.

The trial court heard argument and denied both motions.

---

[14] The parties agreed the issue would be decided by the trial court after the jury's verdict.

*H.     Attorney's Fees*

O'Hara moved for an award of attorney's fees pursuant to section 1988 and Government Code section 3260. The trial court heard argument and awarded attorney's fees in the amount of $594,630. In a written decision, the trial court found O'Hara was "indisputably the prevailing party," and the requested fees were reasonable. Seifert and the District do not challenge these findings.

The trial court also found that the successful section 1983 and FPBOR causes of action were related to the unsuccessful defamation cause of action. The trial court explained that the anonymous letter would have been offered in support of O'Hara's damages whether or not authorship was an issue, and "the context of the letter and its content permeated the litigation and overlapped with several trial witnesses." Accordingly, the trial court concluded that, "apportionment of fees in this case [was] practically impossible." The award of attorney's fees was also added to the judgment.

## II. DISCUSSION

*A.     Motions for Judgment Notwithstanding the Verdict*

We usually review the denial of a motion for judgment notwithstanding the verdict for substantial evidence. (See *Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598 [" 'As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion' "].) But where, as here, " 'the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466; see also *Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 333 [where " ' "the trier of fact has expressly or implicitly concluded that the party

with the burden of proof did not carry the burden and that party appeals," ' generally ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law" ' "].)

Seifert and the District argue the evidence compels findings in their favor as a matter of law on the section 1983 cause of action and the civil penalty award. We are not persuaded.

### 1. *Section 1983*

Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." The elements of a cause of action under section 1983 are: (1) the conduct complained of was committed by a person acting under color of law, and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 704.) The first of these elements is undisputed. Therefore, our analysis will focus on the second.

O'Hara's section 1983 cause of action rests on the due process clause of the Fourteenth Amendment. The United States Supreme Court has recognized three types of section 1983 claims that may be brought against a state official under the due process clause. (*Zinermon v. Burch* (1990) 494 U.S. 113, 125 (*Zinermon*).) First, the plaintiff may bring a claim based on an alleged violation of one of the specific protections defined in the Bill of Rights. (*Ibid.*) Second, the plaintiff may bring a claim based on the substantive component of the due process clause, which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement

them.' " (*Ibid.*)  Third, the plaintiff may bring a claim based on the procedural component of the due process clause, which challenges, not the "deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' " but rather "the deprivation of such an interest without due process of law."  (*Ibid., italics omitted.*)  The parties disagree as to the type of due process claim O'Hara advances.

Seifert and the District argue O'Hara's section 1983 cause of action sounds in procedural rather than substantive due process.  They argue the first amended petition and complaint "raises solely procedural due process issues and not substantive due process issues."[15]  The distinction matters, Seifert and the District say, because violations of procedural due process are not complete unless and until the state fails to provide due process.  (*Kildare v. Saenz* (9th Cir. 2003) 325 F.3d 1078, 1085 ["A procedural due process violation under § 1983 is not complete 'when the deprivation occurs; it is not complete unless and until the State fails to provide due process' "].)  Only then, they continue, does a section 1983 cause of action come into being.  (*Zinermon, supra,* 494 U.S. at pp. 125-126; *Brogan v. San Mateo County* (9th Cir. 1990) 901 F.2d 762, 764

---

[15] Seifert and the District suggest at times that they are trying to mount an attack on the pleadings, rather than a challenge to the denial of their motions for judgment notwithstanding the verdict.  They argue that the failure to state a cause of action can be raised at any time and assert the allegations of the first amended petition and complaint "support nothing more than a procedural due process violation."

We have no quarrel with the idea that defendants can raise the defense of failure to state a cause of action at any time, including for the first time on appeal.  (Code Civ. Proc., § 430.80, subd. (a); *Cedars-Sinai Medical Center v. Superior Court* (1988) 18 Cal.4th 1, 7, fn. 2.)  However, the allegations of the first amended petition and complaint, liberally construed, encompass a section 1983 cause of action based on substantive due process, and O'Hara clearly articulated that theory in the lead up to trial.  We therefore focus on whether the evidence compels a finding in favor of Seifert and the District as a matter of law, rather than the sufficiency of the allegations of the first amended petition and complaint.

["When state remedies are adequate to protect an individual's procedural due process rights, a section 1983 action alleging a violation of those rights will not stand"].)

O'Hara responds that substantial evidence supports the conclusion that Seifert and the District violated his substantive due process rights. Violations of substantive due process are complete "when the wrongful action is taken," such that a plaintiff "may invoke [section] 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights." (*Zinermon, supra,* 494 U.S. at p. 125.) O'Hara argues the evidence at trial showed Seifert and the District deprived him of substantive due process, and therefore, he was not required to exhaust state law remedies before bringing a cause of action under section 1983. We agree with O'Hara, but only to a point.

In their haste to argue O'Hara failed to exhaust state law remedies, Seifert and the District appear to assume the section 1983 cause of action must have been based on procedural due process. But the cause of action could well have been based on substantive due process. As we shall explain, that theory of liability was not only possible, it was also described in the jury instructions and special verdict form.

Having placed all their eggs in the procedural due process basket, Seifert and the District make no attempt to argue the evidence compels a finding in their favor on substantive due process as a matter of law. Because they do not address the sufficiency of the evidence supporting a substantive due process claim, we have no occasion to do so either. We will therefore conclude only that the section 1983 cause of action could have been based on substantive due process, and Seifert and the District fail to carry their burden to show the evidence compelled findings in their favor on that cause of action as a matter of law.

2.       *Substantive Due Process*

The Fourteenth Amendment's due process clause provides that no state may "deprive any person of life, liberty, or property without due process of law." (U.S. Const.

18

14th amend., § 1.)  Substantive due process protects against "certain government actions regardless of the fairness of the procedures used to implement them."  (*Daniels v. Williams* (1986) 474 U.S. 327, 331; see also *Blaylock v. Schwinden* (9th Cir. 1988) 862 F.2d 1352, 1354 ["Substantive due process refers to certain actions that the government may not engage in, no matter how many procedural safeguards it employs"].)

The United States Supreme Court has developed two strands of substantive due process jurisprudence.  The first and most familiar of these holds that substantive due process protects against government interference with fundamental rights and liberty interests.  (See, e.g., *Reno v. Flores* (1993) 507 U.S. 292, 301-302.)  The second holds that substantive due process protects against exercises of government power that "shocks the conscience," even where fundamental liberty interests are not involved.  (See, e.g., *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 846 (*Lewis*); and see *United States v. Salerno* (1987) 481 U.S. 739, 746 [" 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . *or* interferes with rights 'implicit in the concept of ordered liberty' "], emphasis added; see also *Seegmiller v. LaVerkin City* (10th Cir. 2008) 528 F.3d 762, 769 ["the 'shocks the conscience' and 'fundamental liberty' tests are but two separate approaches to analyzing governmental action under the Fourteenth Amendment"]; and see *Howard v. Grinage* (6th Cir. 1996) 82 F.3d 1343, 1349 ["Substantive due process serves as a vehicle to limit various aspects of potentially oppressive government action.  For example, it can serve as a check on legislative enactments thought to infringe on fundamental rights otherwise not explicitly protected by the Bill of Rights; or as a check on official misconduct, which infringes on a 'fundamental right' or as a limitation on official misconduct, which although not infringing on a fundamental right, is so literally 'conscience shocking,' hence oppressive, as to rise to the level of a substantive due process violation"].)

Seifert and the District focus on the "fundamental rights" strand of substantive due process, which requires that the plaintiff show "a deprivation of some fundamental right

or liberty interest that is 'deeply rooted in this Nation's history and tradition.' " (*Tutor-Saliba Corp. v. City of Hailey* (9th Cir. 2006) 452 F.3d 1055, 1061.) They argue public employees do not have a fundamental right to continued employment, and therefore, O'Hara cannot establish a section 1983 cause of action based on substantive due process as a matter of law. This argument is a strawman.

It is true, as Seifert and the District maintain, that most public employees do not have substantive due process rights to their positions. (See, e.g, *Engquist v. Oregon Department of Agriculture* (9th Cir. 2007) 478 F.3d 985, 996-997 (*Engquist*) ["most courts have rejected the claim that substantive due process protects the right to a particular public employment position"]; *Singleton v. Cecil* (8th Cir. 1999) 176 F.3d 419, 425-426 ["a public employee's interest in continued employment with a governmental employer is not so 'fundamental' as to be protected by substantive due process"]; *McKinney v. Pate* (11th Cir. 1994) 20 F.3d 1550, 1560 ["employment rights are state-created rights and are not 'fundamental' rights created by the Constitution"]; *Sutton v. Cleveland Board of Education* (6th Cir. 1992) 958 F.2d 1339, 1350 ["plaintiffs' state-created right to tenured employment lacks substantive due process protection"]; *Nicholas v. Pennsylvania State University* (3rd Cir. 2000) 227 F.3d 133, 143 ["tenured public employment is a wholly state-created contract right; it bears little resemblance to other rights and property interests that have been deemed fundamental under the Constitution"].) But O'Hara has never argued he has a substantive due process right to continued employment with the District.[16] He has instead relied on the "shocks the conscience" strand of substantive due process.

---

[16] O'Hara has occasionally suggested he has a liberty interest in his reputation and career in the fire service, which are different matters. Although public employees do not have substantive due process rights to particular positions, the Ninth Circuit has recognized that "the pursuit of an occupation or profession is a protected liberty interest that extends across a broad range of lawful occupations." (*Wedges/Ledges of California v. City of Phoenix* (9th Cir. 1994) 24 F.3d 56, 65, fn. 4; see also *Truax v. Raich* (1915) 239 U.S. 33,

The shocks the conscience strand of substantive due process was clarified by the United States Supreme Court in *Lewis*. (*Lewis, supra,* 523 U.S. at pp. 845-849.) There, a police officer attempted to stop a motorcycle for speeding. (*Id.* at p. 836.) The motorcycle sped away and a high-speed chase ensued. (*Id.* at p. 836-837.) The chase ended when the motorcycle tipped over, and the officer's patrol car skidded into the motorcycle's passenger, causing fatal injuries. (*Id.* at p. 837.)

The passenger's parents sued the officer for violations of section 1983 based on substantive due process. (*Lewis, supra,* 523 U.S. at pp. 837-838.) The federal district court granted the officer's motion for summary judgment, and the Ninth Circuit reversed, finding the officer's conduct amounted to deliberate indifference. (*Id.* at p. 838 [explaining that the officer disregarded a general order on police pursuits].) The United States Supreme Court granted certiorari to resolve a circuit split over the standard of culpability applicable to violations of substantive due process by law enforcement officers in pursuit cases. (*Id.* at p. 839.) The United States Supreme Court reversed the Ninth Circuit, holding that substantive due process is violated by executive action "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' " (*Id.* at p. 847.) The United States Supreme Court explained: "It should not be surprising that the constitutional concept of conscience-shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability,

_____

41 [recognizing that "the right to work for a living in the common occupations of the community" is the "very essence" of the freedoms secured by the Fourteenth Amendment].) Thus, the Ninth Circuit has held that "a plaintiff can make out a substantive due process claim if she [or he] is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." (*Engquist, supra,* 478 F.3d at p. 997.) "This substantive due process protection is based on a liberty interest in an occupation [citation], and 'protects the right to pursue an entire profession, and not the right to pursue a particular job.' " (*Armstrong v. Reynolds* (9th Cir. 2022) 22 F.4th 1058, 1080, citing *Engquist, supra,* at p. 998.)

21

or clearly toward it, only at the ends of the tort law's spectrum of culpability." (*Id.* at p. 848.)

The United States Supreme Court placed the officer's conduct on one side of the culpability spectrum, emphasizing that he responded immediately and instinctively to the speeding motorcycle, and there was no reason to believe his response was "tainted by an improper or malicious motive." (*Lewis, supra,* 523 U.S. at p. 855.) By contrast, the United States Supreme Court explained, "behavior on the other end of the culpability spectrum," such as "conduct intended to injure in some way unjustifiable by any government interest" would be "the sort of official action most likely to rise to the conscience-shocking level." (*Id.* at p. 849.) Here, of course, Seifert's culpability was a central issue at trial. But the application of the conscience-shocking standard in contexts other than police pursuits is not immediately apparent.

Our Supreme Court grappled with the conscience-shocking standard in another context—one closer to ours—in *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1031-1034 (*Galland*). There, the owners of a mobilehome park brought "two distinct due process claims under section 1983" against the city. (*Id.* at p. 1020.) The first claim stemmed from city's failure to grant requested rent increases, resulting in confiscatorily low rents. (*Ibid.*) The second stemmed from the city's rent adjustment procedure, which was so time-consuming, burdensome, and expensive as to amount to an independent violation of substantive due process. (*Id.* at p. 1030.) As the *Galland* court put it, "the source of [the plaintiffs'] injury was not the lack of procedural protections that led to the denial of a fair rent increase, but the fact that [the city] made demands on them as a condition of obtaining a rent increase that, in addition to being costly, were intrinsically arbitrary and irrational. This is best understood as a claimed violation of substantive due process." (*Ibid.*)

The *Galland* court reviewed *Lewis* and other cases involving substantive due process claims, all of which "have affirmed in a variety of contexts, using a variety of

verbal formulations, the principle that the arbitrary government conduct that triggers a substantive due process violation is not ordinary government error but conduct that is in some sense outrageous or egregious—a true abuse of power." (*Galland, supra,* 24 Cal.4th at p. 1032.)  The court observed that the shocks the conscience standard "seems especially apt with regard to assaults on bodily integrity by government officials—when, as Justice Frankfurter stated, government action moves 'too close to the rack and screw to permit of constitutional differentiation.' " (*Id.* at p. 1033-1034, citing *Rochin v. California* (1952) 342 U.S. 165, 172.)  But the court found the standard less helpful in other contexts.  (*Galland, supra,* at p. 1033 ["The shocks the conscience standard, although generally applicable, is not particularly helpful"].)  Given these limitations, the court asked:  "Is there a standard that can identify more precisely when the actions of an administrative body charged with implementing the law are arbitrary and conscience-shocking in a constitutional sense?"  (*Id.* at p. 1034.)

The *Galland* court found an answer in *Silverman v. Barry* (D.C. Cir. 1988) 845 F.2d 1072, in which the federal appellate court stated:  " 'To succeed in a [section] 1983 suit for damages for a substantive due process . . . violation, a plaintiff must at least show that state officials are guilty of grave unfairness in the discharge of their legal responsibilities.  Only a substantial infringement of state law prompted by a personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under [section] 1983.' " (*Galland, supra,* 24 Cal.4th at p. 1034, citing *Silverman v. Barry, supra,* at p. 1080, italics omitted.)  The court thus concluded that the "deliberate flouting" test is the "appropriate substantive due process standard for determining when an administrative body charged with implementing a law acts erroneously in such a way as to injure an individual's economic and property interests." (*Galland, supra,* at p. 1033.)  We perceive an important connection between the United States Supreme Court's opinion in *Lewis,* our Supreme Court's opinion in *Galland*, and the jury instructions given here.

23

The trial court here instructed the jury with the Judicial Council's California Civil Jury Instruction (CACI) No. 3000 (Violation of Federal Civil Rights – In General – Essential Factual Elements (§ 1983).  The instruction was specifically modified— seemingly without objection—to incorporate the "deliberate flouting" test.  The special verdict form thus asked, "Did Fire Chief Stanley Seifert intentionally or by deliberately flouting of the law deny Timothy O'Hara due process of law?"   The special verdict form also asked, if the jury answered yes to the preceding question, whether "Timothy O'Hara proved by clear and convincing evidence that Fire Chief Stanley Seifert engaged in the conduct with an evil motive or demonstrate[d] reckless indifference to Timothy O'Hara's constitutional rights?"  The jury answered "Yes" to both questions, indicating Seifert acted with the culpability required for a substantive due process violation under *Galland*.

Seifert and the District do not discuss the shocks the conscience strand of substantive due process.  Although O'Hara has consistently relied on *Lewis*, they do not mention that case at all in their opening brief, and summarily dismiss it as "inapposite" in their late-filed reply.  Seifert and the District give similarly short shrift to the deliberate flouting standard with which the jury was instructed and offer no challenge to the special verdict finding that Seifert intentionally trammeled O'Hara's rights under the FPBOR.  Under the circumstances, we need not consider whether the evidence compels findings in their favor on the theory they violated substantive due process by intentionally and deliberately flouting the FPBOR as part of a personal vendetta against O'Hara.  We need only conclude that Seifert and the District have failed to show the evidence compels findings in their favor on substantive due process as a matter of law.  They likewise fail to show the trial court erred in denying the motions for judgment notwithstanding the verdict so far as the section 1983 cause of action was concerned.

*3.    Civil Penalty*

Seifert and the District next argue the trial court erred in denying their motion for judgment notwithstanding the verdict with respect to the civil penalty.  They argue the

24

FPBOR only authorizes the trial court to assess civil penalties in conjunction with injunctive or other extraordinary relief.[17]  O'Hara no longer seeks injunctive or extraordinary relief; therefore, Seifert and the District say he cannot recover the civil penalty as a matter of law.  Here again, Seifert and the District fail to carry their burden on appeal.

Seifert and the District find support for their argument in *Gales v. Superior Court* (1996) 47 Cal.App.4th 1596 (*Gales*), in which the court considered the Public Safety Officers Procedural Bill of Rights (POBOR).  (Gov. Code, § 3300 et seq.; see generally *Corley v. San Bernardino County Fire Protection District* (2018) 21 Cal.App.5th 390, 400-401 [observing that the text and legislative history of the FPBOR "unequivocally demonstrate" that the FPBOR was modeled on the POBOR].)  Seifert and the District would have us read *Gales* to require that "any request for a civil penalty, like actual

---

[17] Government Code section 3260, subdivision (b) gives the superior court initial jurisdiction over any proceeding brought by any firefighter against any employment department under the FPBOR.  (Gov. Code, § 3260, subd. (b).)  Subdivision (c)(1) provides:  "If the superior court finds that the employing department . . . has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, granting of a temporary restraining order or preliminary or permanent injunction prohibiting the employing department . . . from taking any punitive action against the firefighter."  (Gov. Code, § 3260, subd. (c)(1).)

Subdivision (d), with which we are principally concerned, provides, in part:  "In addition to the extraordinary relief afforded by this chapter, upon a finding by a superior court that a fire department, its employees, agents, or assigns, with respect to acts taken within the scope of employment, maliciously violated any provision of this chapter with the intent to injure the firefighter, the fire department shall, for each and every violation, be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) to be awarded to the firefighter whose right or protection was denied and for reasonable attorney's fees as may be determined by the court."  (Gov. Code, § 3260, subd. (d).)

damages, be made in connection with a request for injunctive or extraordinary relief."
Their argument places more weight on *Gales* than that case can bear.

In *Gales*, the plaintiff, a lieutenant with the Pasadena Police Department, was investigated for misconduct by his employer. (*Gales, supra,* 47 Cal.App.4th at p. 1599.) He was found to have committed misconduct and demoted to sergeant. (*Ibid.*) He then filed an administrative appeal, which he lost. (*Ibid.*)

The plaintiff brought an action against the police department and four supervisors. (*Gales, supra,* 47 Cal.App.4th at p. 1599.) As relevant here, he alleged that the department violated his rights under Government Code former section 3309.5 by subjecting him to an " 'arbitrary, unfair and dishonest' " internal affairs investigation. (*Gales, supra,* at p. 1599.) He did not file a petition for administrative mandate (Code Civ. Proc., § 1094.5) or seek any other injunctive or extraordinary relief. (*Gales, supra,* at p. 1599.)

The plaintiff moved for summary judgment, and the trial court denied the motion, finding the plaintiff's failure to file a petition for administrative mandate was fatal to his claim for damages. (*Gales, supra,* 47 Cal.App.4th at pp. 1599-1600.) The Court of Appeal affirmed, stating: "Nothing contained within [former] section 3309.5 suggests that a police officer may, as Gales has done, file a civil action seeking a legal remedy of damages (compensatory and punitive) for past injuries, and have a jury determine whether a violation of the [POBOR] occurred, and whether the administrative decision imposing discipline should be upheld." (*Id.* at p. 1602.) Instead, the court said, the plaintiff was required to file a petition for administrative mandate and could file a concurrent action pursuant to the POBOR, if he so chose. (*Id.* at pp. 1602-1603.)

*Gales* does not establish error. The court's opinion does not say actions for damages or civil penalties under the POBOR must be accompanied by prayers for injunctive or extraordinary relief. The court only addressed "whether a police officer is entitled—*after the public entity employer has issued its final decision*—to file an action

26

under section 3309.5." (*Gales, supra,* 47 Cal.App.4th at p. 1602, emphasis added; see also *Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 946 [emphasizing the narrowness of *Gales* and observing that the opinion does not provide a roadmap for police officers "who only allege a violation of their rights to speedy discipline" under the POBOR].) Here, of course, O'Hara could not pursue a petition for writ of administrative mandate because the District never rendered any administrative decision capable of being reviewed.

Seifert and the District's reliance on *Gales* is misplaced for another, more fundamental reason. Contrary to their suggestion, the *Gales* court had no occasion to consider whether damages or civil penalties were available to officers in the absence of a prayer for injunctive or extraordinary relief, because the version of the statute then in effect made no provision for damages or civil penalties. (*Gales, supra,* 47 Cal.App.4th at p. 1601, quoting Gov. Code, former § 3309.5; see also *Antuna v. County of Los Angeles* (C.D. Cal. Nov. 13, 2015, CV 14-05600-MWF) 2015 U.S. Dist. LEXIS 200492, *6 [noting the plaintiff in *Gales* "brought suit when POBOR only authorized 'injunctive or extraordinary relief' "].) Section 3309.5 was not amended to provide for damages and civil penalties until 2002, some six years later. Consequently, the court had no reason to consider the circumstances under which damages or civil penalties might be available. Seifert and the District's reliance on *Gales* is unavailing. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [" 'It is axiomatic that cases are not authority for propositions not considered' "].)

In the absence of any other authority or argument to support their challenge to the civil penalty (and none appears), we conclude Seifert and the District have failed to show they were entitled to judgment notwithstanding the verdict as a matter of law. We therefore conclude the motions for judgment notwithstanding the verdict were properly denied.

27

*B.     Damages and Tax Gross-Up Award*

Seifert and the District next challenge the jury's awards of economic and noneconomic damages in the special verdict and the trial court's tax gross-up award. We will consider—and reject—these challenges momentarily.

*1.     Standard of Review*

Whether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review. [Citations.] The amount of damages, on the other hand, is a fact question committed to the discretion of the trial judge on a motion for new trial; an award of damages will not be disturbed if it is supported by substantial evidence." (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.) "All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule. . . . [¶] . . . [¶] . . . [We] do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.) "The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure." (*Toscano v. Greene Music, supra,* at p. 691.)

*2.     Economic Damages*

Seifert and the District raise several challenges to the jury's award of economic damages. They argue: (1) the award was erroneous because O'Hara failed to establish that his termination was substantively wrongful and/or that he was entitled to reinstatement; (2) the award was improper because there was no substantial evidence

28

O'Hara made appropriate efforts to mitigate damages; and (3) the award was improper because the jury miscalculated front pay. None of these contentions has merit.

### a. Merits of Termination and Potential for Reinstatement

Seifert and the District argue the award of economic damages was erroneous. In a variation on a now-familiar theme, they argue O'Hara was seeking economic damages for violations of procedural due process and, as such, should have been required to establish that his termination was substantively wrongful (for back pay) or that he was entitled to reinstatement (for front pay). (See, e.g., *Brewer v. Chauvin* (8th Cir. 1991) 938 F.2d 860, 864 [damages for denial of procedural due process should include back pay "only when there is a finding that the discharge would not have occurred if the employee's procedural due process rights had been observed"]; and see *Thorne v. City of El Segundo* (9th Cir. 1986) 802 F.2d 1131, 1136 [a plaintiff is entitled to front pay as an alternative to reinstatement where reinstatement would be "inappropriate due to excessive hostility or antagonism between the parties"].) These arguments are expressly based on the premise that O'Hara's section 1983 cause of action was necessarily based on procedural due process, which we have already rejected. Having done so, we likewise reject Seifert and the District's contention that O'Hara was required to show his termination was substantively wrongful or he was entitled to reinstatement as a condition precedent to recovering economic damages.

### b. Mitigation of Damages

Seifert and the District next challenge the sufficiency of the evidence that O'Hara made appropriate efforts to mitigate damages. They declare, "the evidence is uncontroverted that O'Hara failed to mitigate his damages." Not so.

The right to recover damages in civil actions is qualified by the common law doctrine of avoidable consequences. Under the doctrine, "a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditure." (*State Dept. of Health Services v.*

29

*Superior Court (McGinnis)* (2003) 31 Cal.4th 1026, 1043; see also *Smith v. Wade* (1983) 461 U.S. 30, 34 [explaining that § 1983 is a " 'species of tort liability' " and approving reliance on common law tort principles in interpreting the statute].)

In the analogous context of employment actions, "the burden to prove failure to mitigate damages lies squarely with the employer." (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 409.) "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. [Citations.] However, before projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181-182 (*Parker*).) Put another way, "[t]he employer bears the burden of proving that 'comparable, or substantially similar' employment was available to the employee." (*Kern v. Levolor Lorentzen, Inc.* (9th Cir. 1990) 899 F.2d 772, 778, citing *Parker, supra,* at pp. 181-182.) Whether the employer met this burden is a question of fact subject to review for substantial evidence. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., USA* (2013) 221 Cal.App.4th 867, 884.)

Seifert and the District insist O'Hara failed to conduct a reasonable search for another firefighting job. They observe that O'Hara applied for only one firefighting job following his termination (the Lathrop Manteca position) and emphasize Cohen's testimony that there were 193 postings for jobs in the area for which he could have applied. This contrast does not provide a reason to reverse the jury's economic damage award.

The jury heard evidence that O'Hara was a veteran firefighter with nearly 30 years of experience, who held a supervisory position within the District. The jury also heard evidence that there were lots of openings for entry-level firefighters, but very few opportunities for experienced firefighters. Although Cohen testified to the existence of numerous job postings, he made no effort to distinguish between entry-level and lateral opportunities. So far as Cohen's testimony revealed, all or most of the postings could have been for entry-level positions. On the record before us, the trial court, sitting as an independent trier of fact, could have reasonably concluded that Seifert and the District failed to carry their burden of showing that comparable or substantially similar employment was available.

The trial court could have also concluded that O'Hara had no realistic chance of ever obtaining another firefighting position, even assuming an equivalent position were available. As noted, O'Hara testified he would have to compete with an applicant pool of "thousands" of younger, more vigorous candidates for any entry-level position, and there was essentially no chance, at his age, that he would be able to outperform them in physical agility tests. As for lateral opportunities, the trial court could reasonably credit O'Hara's theory that his "three strikes"—the anonymous letter, termination, and lawsuit—made finding another firefighting job all but impossible.[18] Given these obstacles, the trial court could reasonably conclude that O'Hara made sufficient efforts to mitigate damages, despite the fact that O'Hara only applied to one firefighting job. (See

---

[18] Seifert and the District argue that O'Hara's "three strikes" theory was speculative, and therefore, not substantial evidence. But O'Hara was competent to testify about his own job search (cf. *Duncan v. Washington Metropolitan Area Transit Authority* (D.C. Cir. 2001) 240 F.3d 1110, 1116-1117 [plaintiffs in disability cases may testify about their own job searches and need not rely on vocational experts]), and the jury and trial court were free to give his testimony the weight they thought it deserved.

31

*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691 ["The duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable"].)

> c.     *Calculation of Front Pay*

Seifert and the District next challenge the jury's front pay award.  They note O'Hara's expert, Enos, proposed two front pay scenarios:  one in which O'Hara would continue working for the District for the rest of his working life (in which case, his total economic losses would be $1,402,938); and one in which he would have started as a captain at Waterloo-Morada in September 2018, and remained in that position for the rest of his working life (in which case, his total economic losses would be $2,082,494).  They argue without citation to relevant authority that the award was "patently erroneous" because it was based on the higher paying Waterloo-Morada position.[19]  We are not persuaded.

California courts treat front pay as a damage issue for the trier of fact.  (See *Mize-Kurzman v. Marin Community College District* (2012) 202 Cal.App.4th 832, 873, fn. 17 ["Front pay is measured by the employee's projected earnings and benefits over the period of time until he or she is likely to become reemployed or likely to retire, where reemployment is unlikely"], disapproved on another ground in *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 734.)  The trial court could reasonably conclude that front pay should be based on what O'Hara would have received had he acquired the job at Waterloo-Morada.

A federal appellate court considered a similar issue in *Hayes v. SkyWest Airlines, Inc.* (10th Cir. 2021) 12 F.4th 1187 (*Hayes*).  There, the district court awarded more than

---

[19] Seifert and the District direct our attention to *Parker, supra,* 3 Cal.3d at pp. 181-182, *California School Employees Assn. v. Personnel Commission* (1973) 30 Cal.App.3d 241, 250, and *Martin v. Santa Clara Unified School District* (2002) 102 Cal.App.4th 241, 250. These cases deal with mitigation of damages, not front pay.

$300,000 in front pay to an airline employee who was terminated in violation of the Americans with Disabilities Act, the Rehabilitation Act, and the Family and Medical Leave Act. (*Id.* at p. 1192.) The district court found that the employer's discrimination prevented the employee from obtaining a position with the employer's successor. (*Id.* at pp. 1192-1193.) The employer appealed, and the federal appellate court affirmed the award, stating: "Some courts have held that when, but for the defendant's discrimination, a third-party employer would have hired the plaintiff at a higher wage, the court should measure the plaintiff's *back pay* award by the higher wage which the defendant's actions denied him. [Citation.] This rule works to make the plaintiff whole when a causal connection exists between the loss of opportunity for higher wage and the discriminatory action. The district court reasoned that where a defendant's discriminatory conduct denies a plaintiff an employment opportunity with a successor or other third party, a court should also measure a *front pay* award based on the position and wage the plaintiff would have held but for the discrimination. [¶] We agree with the district court that this is an appropriate and equitable rule." (*Id.* at p. 1206, fn. omitted.)

Here, there was evidence from which the jury, and later, the trial court, could infer that (1) O'Hara would not have been terminated had he received due process, and (2) Waterloo-Morada would have hired O'Hara had he not been terminated. It was undisputed that O'Hara was an excellent firefighter, and Seifert and the District terminated him without due process. From this evidence alone, the jury and trial court could have concluded that O'Hara would not have been terminated had he received due process. It was also undisputed that O'Hara was next on the hiring list for an open captain's position at Waterloo-Morada, and Chief Henry decided against filling the position upon learning of the termination. From this evidence, the jury and trial court could infer that O'Hara would have been hired by Waterloo-Morada had he not been terminated. Putting these inferences together, the jury and trial court could also infer that O'Hara would have secured the higher paying captain's position but for Seifert and the

33

District's violations of the FPBOR. Substantial evidence thus supports the front pay award.

### 3. *Noneconomic Damages*

Siefert and the District next challenge the jury's award of noneconomic damages for emotional distress. They argue the award should be reversed because the evidence fails to show that O'Hara's emotional distress was caused by the denial of due process, rather than the loss of his firefighting career.[20] We are not persuaded.

"A plaintiff who establishes liability for deprivations of constitutional rights actionable under [section] 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations," including "compensation for economic harm, pain and suffering, and mental and emotional distress that results from the violations." (*Borunda v. Richmond* (9th Cir. 1988) 885 F.2d 1384, 1389.) Compensatory damage awards under section 1983 are ordinarily determined according to common law tort principles, which require a showing of causation and actual injury. (*Memphis Community School Dist. v. Stachura* (1986) 477 U.S. 299, 305-306.) Section 1983 plaintiffs can only recover compensatory damages for actual injuries caused by the deprivation of the constitutional right. (*Carey v. Piphus* (1978) 435 U.S. 247, 264.) In the absence of proof of actual injury, section 1983 plaintiffs can only recover nominal damages. (*Carey, supra,* at p. 248.)

The jury heard evidence that O'Hara suffered serious emotional distress following his termination. O'Hara and Denise (O'Hara's wife) each testified that he mourns the loss of his firefighting career, has difficulty sleeping, and experiences pervasive feelings of worthlessness and powerlessness. Neither expressly connected O'Hara's distress to

---

[20] Seifert and the District also argue the award was erroneous because O'Hara failed to establish that his termination was substantively wrongful. We reject his contention for the reasons previously stated.

the denial of due process. Nevertheless, there was evidence from which the jury and trial court could have inferred that the denial of due process led to O'Hara's termination, which in turn caused O'Hara's distress. There was also evidence from which the jury and trial court could have inferred that O'Hara was distressed by the *manner* of his termination. Among other things, O'Hara testified the termination was a "shock," which he never saw coming because he had not received any of the process required by the FPBOR.

On the record before us, we perceive ample evidence from which the jury and trial court could have found that the violations of due process were an actual and proximate cause of O'Hara's emotional distress. (*Lies v. Farrell Lines, Inc.* (9th Cir. 1981) 641 F.2d 765, 770 ["Causation is generally a question of fact for the jury, unless 'the proof is insufficient to raise a reasonable inference that the act complained of was the proximate cause of the injury' "].) Seifert and the District do not argue the award of noneconomic damages was high enough to shock the conscience of the court or so "grossly disproportionate as to be without evidentiary support." (Cf. *Uva v. Evans* (1978) 83 Cal.App.3d 356, 364.) Therefore, we see no reason to disturb the jury's special verdict or the trial court's order denying the new trial motion as to noneconomic damages.

### 4. *Tax Gross-Up Award*

Seifert and the District next challenge the trial court's tax gross-up award. They observe that no California or federal appellate case appears to have considered the availability of tax gross-ups in section 1983 actions and conclude the award must be reversed as unauthorized. Once again, we disagree.

A majority of federal appellate courts have held that district courts have discretion to award tax gross-ups under statutes authorizing "make whole" awards. (See, e.g., *Clemens v. CenturyLink* (9th Cir. 2017) 874 F.3d 1113, 1117 [under Title VII, which vests courts with equitable discretion to ensure adequate compensation, "the decision to award a gross up—and the appropriate amount of any such gross up—is left to the sound

discretion of the district court"]; *Eshelman v. Agere Systems, Inc.* (3rd Cir. 2009) 554 F.3d 426, 441-442 ["a district court may, pursuant to its broad equitable powers granted by the [Americans with Disabilities Act] award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create]; and see *Sears v. Atchison, Topeka & Santa Fe Railway, Co.* (10th Cir. 1984) 749 F.2d 1451, 1456 [upholding tax neutrality award under Title VII because, "the trial court has wide discretion in fashioning remedies to make victims of discrimination whole"]; but see *Dashnaw v. Pena* (D.C. Cir. 1994) 12 F.3d 1112, 1116 [rejecting request for gross-up as unsupported by then-existing case law].) At least one California appellate court has similarly concluded that trial courts can award gross-up damages to offset the tax consequences of lump sum awards in appropriate cases. (See *Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147, 1163-1164 [trial court appropriately awarded gross-up damages to physician suspended from hospital without due process in violation of common law fair procedure doctrine, Bus. & Prof. Code, § 809 et seq.].)

*Barber v. State Personnel Bd.* (2019) 35 Cal.App.5th 500, on which Seifert and the District rely, does not compel a contrary conclusion. There, a public employee, Barber, was terminated without due process and ordered reinstated with backpay and benefits. (*Id.* at pp. 505-506.) The lump sum backpay award resulted in an increased tax liability, which Barber sought to recover under Government Code section 19584.[21] (*Barber, supra,* at p. 506.) An administrative law judge rejected Barber's request, and the trial court denied his writ petition. (*Id.* at pp. 508-510.) A divided appellate court

_____

[21] Government Code section 19584 provides, in pertinent part: "Whenever the board revokes or modifies an adverse action and orders that the employee be returned to his or her position, it shall direct the payment of salary and all interest accrued thereto, and the reinstatement of all benefits that would otherwise have normally accrued. 'Salary' shall include salary, as defined in [Government Code] Section 18000, salary adjustments and shift differential, and other special salary compensations, if sufficiently predictable."

36

affirmed, holding gross-up damages could not be considered "salary" within the meaning of Government Code section 19584.  (*Barber, supra,* at pp. 513-514, 518.)  The majority distinguished federal cases authorizing gross-up awards (including the above-cited cases), noting "they are founded on federal legislation that includes language expressly allowing for broad equitable relief."  (*Id.* at p. 522.)  Government Code section 19584 "does not include such language."  (*Barber, supra,* at p. 522.)  "Therefore," the majority concluded, "Barber is not entitled to equitable relief, where none is authorized."  (*Ibid.*)

Here, of course, O'Hara sought and received an award of gross-up damages under section 1983.  Unlike Government Code section 19854, which limits an employee's recovery to salary and associated benefits, "Federal law is silent on the remedies available to those suing for a violation of their civil rights under section 1983."  (*County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292, 297.)  "Therefore, courts can look to 'both federal and state rules on damages . . ., [choosing] whichever better serves the policies expressed in the federal statute[].'  [Citations.]  This means that the remedies available in section 1983 actions may include equitable relief as well as compensatory and punitive damages."  (*Ibid.*; see also *Barbano v. Madison County* (2nd Cir. 1990) 922 F.2d 139, 146 ["District courts should fashion remedies ensuring that victims . . . are made whole"].)

Seifert and the District do not make any serious attempt to argue that the discretion to fashion an appropriate remedy under section 1983 does not include the discretion to award gross-up damages.  Under the circumstances, we conclude they have failed to establish error.

C.     *Attorney's Fees*

Finally, Seifert and the District argue the trial court erred in apportioning attorney's fees between O'Hara's successful section 1983 and FPBOR causes of action and his unsuccessful defamation cause of action.  We perceive no error.

37

Section 1988 authorizes the trial court to award "a reasonable attorney's fee" to the "prevailing party" in an action under section 1983. (§ 1988(b); see also Gov. Code, § 3260, subd. (d) [providing for "reasonable attorney's fees as may be determined by the court"].) We review awards of attorney's fees under section 1988 for abuse of discretion.[22] (*McFadden v. Villa* (2001) 93 Cal.App.4th 235, 237.)

California courts have long held that determining a "reasonable" fee properly takes into account the extent of a party's success. (See *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989 (*Chavez*) ["If a plaintiff has prevailed on some claims but not others, fees are not awarded for time spent litigating claims unrelated to the successful claims, and the trial court 'should award only that amount of fees that is reasonable in relation to the results obtained,' " quoting *Hensley v. Eckerhart* (1983) 461 U.S. 424, 440].)

*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 (*Harman*), spells out a two-step process for arriving at a reasonable fee award that appropriately reflects limited success. (*Id.* at pp. 416-418.) The process begins by determining "the lodestar," which is the " ' "number of hours reasonably expended on the litigation times a reasonable hourly rate." ' " (*Id.* at p. 416; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 ["the fee setting inquiry in California ordinarily begins with the 'lodestar' "].) In this first step, the trial court should exclude hours spent

---

[22] Seifert and the District argue our review should be de novo because the trial court relied on an incorrect legal standard in awarding fees. They point to the following statement from the trial court's decision: "The court recognizes in procedural due process claims the court must consider whether there was only a partial or limited success and may need to reduce the amount of fees." Seifert and the District suggest the statement shows the trial court thought O'Hara achieved partial success on the section 1983 cause of action. However, the rest of the decision makes clear that the trial court understood that O'Hara achieved success on the section 1983 cause of action but not the defamation cause of action. We reject the contention that the trial court applied the wrong legal standard.

solely on unsuccessful claims, as such hours cannot be deemed to have been reasonably expended on the claims on which the party prevailed and for which he or she is entitled to fees. (*Harman, supra*, at p. 417.) Such apportionment is not appropriate, however, when successful and unsuccessful claims " ' "involve a common core of facts or are based on related legal theories" ' " or when time spent on successful and unsuccessful claims is " 'so inextricably intertwined that it would be impractical or impossible' " to allocate the attorney's time. (*Ibid.*; see also *Chavez, supra,* 47 Cal.4th at p. 989.)

Even when initial apportionment in determining the lodestar is not possible (i.e., when claims are interrelated), under *Harman*'s second step, the trial court must "still evaluate the 'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation' " and determine if a reduction in lodestar fees is appropriate. (*Harman, supra,* 158 Cal.App.4th at pp. 417-418.) " 'In conducting this analysis, a court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." ' " (*Id.* at p. 418.) Our Supreme Court has emphasized that, "the extent of a plaintiff's success is a crucial factor." (*Chavez, supra,* 47 Cal.4th at p. 989; see *ibid.* [noting "[o]n this point, California law is consistent with federal law"]; see also *Farrar v. Hobby* (1992) 506 U.S. 103, 114 [" 'the most critical factor' " in determining the reasonableness of a fee award under § 1988 " 'is the degree of success obtained' "].) The focus in this regard is a comparison of the litigant's stated goals with the ultimate recovery, and not proportionality between the result and the fee award. (*Chavez, supra,* at p. 989 ["attorney fees need not be strictly proportionate to the damages recovered" but " '[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief [citation], the only reasonable fee is usually no fee at all' "]; *Harman, supra,* at p. 420.)

Seifert and the District argue the trial court erred in finding the section 1983 and FPBOR causes of action and defamation cause of action were related. As explained

39

above, related claims " ' "involve a common core of facts or are based on related legal theories." ' " (*Harman, supra,* 158 Cal.App.4th at p. 417.) To be unrelated, an unsuccessful claim must seek " ' " to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which" ' " the successful claim was based. (*Id.* at p. 423.)

We cannot say that the section 1983 and FPBOR causes of action were "entirely distinct and separate" from the defamation cause of action. As the trial court observed, "the defamatory letter itself and the context of the letter and its content permeated the litigation and overlapped with several trial witnesses." The trial court could reasonably conclude the defamation cause of action, which was based on the letter, was factually related to the section 1983 and FPBOR causes of action. As noted, the letter appeared in the period preceding O'Hara's termination, when tensions with Seifert were coming to a boil, and O'Hara was actively seeking employment at Waterloo-Morada. It is true, of course, that authorship of the letter was contested, and the jury declined to find Seifert responsible. Nevertheless, the trial court could reasonably conclude the letter was an important—even precipitating—event in the lead up to O'Hara's termination and thus, that all causes of action involved a common core of facts.

The trial court could also reasonably conclude that the defamation cause of action was legally related to the section 1983 and FPBOR causes of action. As previously discussed, the letter was circulated to fire stations throughout San Joaquin County and was legally related to O'Hara's damages and Seifert and the District's mitigation defense. The letter was also relevant to Seifert's state of mind, which was at issue in both the section 1983 and FPBOR causes of action. Although the jury found Seifert was not responsible for writing the letter, there was evidence supporting the opposite conclusion, which would have been related to the question of malice. That question, in turn, was legally related to O'Hara's demand for punitive damages under section 1983 and civil penalties under the FPBOR. The trial court, having heard the entire case, was in the best

40

position to determine whether the issues were so intertwined that apportionment would be impossible or impractical. (See *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 556.) No abuse of discretion appears.

## III. DISPOSITION

The judgment is affirmed. Respondent shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____
RENNER, J.


We concur:


/S/

_____
EARL, P. J.


/S/

_____
MESIWALA, J.

41